# EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT
OF
CHICAGO SOUTH LOOP HOTEL OWNER, LLC

This Limited Liability Company Agreement (together with the schedules attached hereto, this "Agreement") of CHICAGO SOUTH LOOP HOTEL OWNER, LLC (the "Company"), is made as of October 23, 2013 and is entered into by CHICAGO SOUTH LOOP HOTEL, LLC, an Illinois limited liability company with an address at 2600 South State Street, Chicago, Illinois (the "Member", and together with any other member(s) admitted after the date hereof, the "Members"), and Brian McCarthy, as the Springing Member (as defined herein). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

WHEREAS, the Member has formed the Company as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"); and

NOW THEREFORE, the Member hereby agrees as follows:

Section 1.    Name.

The name of the limited liability company is CHICAGO SOUTH LOOP HOTEL OWNER, LLC.

Section 2.    Principal Business Office.

The principal business office of the Company shall be located at 2600 South State Street, Chicago, Illinois 60616.

Section 3.    Registered Office.

The address of the registered office of the Company in the State of Delaware is c/o VCorp Services, LLC, 1811 Silverside Road, Wilmington, Delaware 19810 or such other location as may hereafter be determined by the Member.

Section 4.    Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is VCorp Services, LLC, 1811 Silverside Road, Wilmington, Delaware 19810.

Section 5.    Members.

(a)    The mailing address of the Member is set forth on Schedule B attached hereto.

(b)    The Member may act by written consent.

(c)    The Member shall at all times cause there to be at least one Person bound by this Agreement as a Springing Member. Upon the occurrence of any event that causes the Member

to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee, or (ii) the resignation of the Member and the admission of an additional member of the Company, the Springing Member shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement; provided, however, the Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member. Each Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, each Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to implement the admission to the Company of each Special Member, each Springing Member shall execute a counterpart to this Agreement. Prior to its admission to the Company as Special Member, the Springing Member shall not be a member of the Company.

Section 6.     Certificates.

Farah Moiso is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, her powers as an "authorized person" ceased. The Member may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.    <u>Purpose</u>. The purposes to be conducted or promoted by the Company are (i) to own, operate, lease, finance, maintain and sell that certain real property and improvements located at 2600 South State Street, Chicago, Illinois 60616 (the "<u>Property</u>") and more commonly known as The Chicago South Loop Hotel and (ii) to exercise any powers permitted to limited liability companies formed under the laws of the State of Delaware that are incidental to the purpose outlined in clause (i) above. The Company shall at all times meet the definition of a Special Purpose Entity set forth on <u>Schedule C</u> attached hereto and made a part hereof.

Section 8.    <u>Powers</u>.

The Company, and the Member on behalf of the Company, (i) shall have and exercise (subject to any limitations set forth herein) all powers necessary, convenient or incidental to accomplish its purposes as set forth in <u>Section 7</u> and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.    <u>Management</u>.

The business and affairs of the Company shall at all times be managed by or under the sole direction of the Member. The Member hereby approves and ratifies the borrowing of that certain $6,800,000.00 mortgage loan (the "<u>Loan</u>") from Morgan Stanley Mortgage Capital Holdings LLC, a Delaware limited liability company (together with its successors and assigns, "<u>Lender</u>"), which Loan will be secured by, among other things, a first lien on the Property. Notwithstanding any other provision of this Agreement to the contrary, Member approves and ratifies the execution and delivery by the Company and the Member, an Authorized Signatory or any officer on behalf of the Company, of one or more of the following documents (collectively, the "<u>Loan Documents</u>"): (i) Promissory Note in the original principal amount of $6,800,000.00, (ii) Mortgage, Security Agreement and Fixture Financing Statement, (iii), Assignment of Leases and Rents (iv) Environmental Indemnity Agreement, (v) Conditional Assignment and Subordination of Management Agreement, (vi) Cash Management Agreement, (vii) Deposit Account Control Agreement and (viii) any and all other documents which may be required by Lender in connection with the Loan or deemed necessary and advisable by the Authorized Signatory without any further act, vote or approval. The Member resolves each and every action taken by the Company and Louis P. Dodd with respect to the Loan prior to the date and adoption of the foregoing resolutions which would have been authorized by the foregoing resolutions but for the fact that such actions were taken prior to such date, be, and each hereby is ratified, approved, confirmed and adopted. For the purposes hereof, Louis P. Dodd is hereby appointed as "Authorized Signatory" to execute and deliver, on behalf of the Company, any and all documents in connection with the Loan, including, without limitation, the Loan Documents.

Section 10.    <u>Limited Liability</u>.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company.

Section 11.    Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto.  The limited liability company interests of the Company are allocated as follows:

CHICAGO SOUTH LOOP HOTEL, LLC:        100%

Section 12.    Additional Contributions.

(a) ·    The Members are not required to make any additional capital contribution to the Company beyond their initial capital contribution(s).

(b)    The Member may request one or more additional capital calls (each a "Call") in an amount approved by the Member.  No Member shall be obligated to meet such Call, and failure to meet any Call shall not result in any dilution or "squeeze-down" of a non-participating Member's interest.

Section 13.    Allocation of Profits and Losses; Distributions.

The profits and losses of the Company shall be allocated among the Members on the basis of the value of each Member's capital contributions to the Company.

Section 14.    Distributions.

Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Member.  The Company shall allocate distributions on the basis of value of each Member's capital contributions to the Company.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members on account of its interest in the Company if such distribution would violate the Act or any other applicable law.

Section 15.    Books and Records.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The Members and their duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours.  The Company's books of account shall be kept using the method of accounting determined by the Member.  The Company's independent auditor, if any, shall be an independent public accounting firm or accountant agreed to by the Members.

Section 16.    Other Business.

Notwithstanding any duty otherwise existing at law or in equity, the Members may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 17.    Exculpation and Indemnification.

(a)    To the fullest extent permitted by applicable law, neither the Member nor any other Member (and any officer, director, employee, agent or Affiliate of the foregoing, collectively, the "Covered Persons") shall be liable to the Company or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's willful misconduct.

(b)  .  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 17 by the Company shall be provided out of and to the extent of Company assets only, and the Members shall not have personal liability on account thereof; provided further, that so long as the Loan is outstanding any indemnity under this Section 17 shall be fully subordinate to the debt secured by the Loan Documents.

 .  (c)    To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 17.

(d)    For so long as the Loan shall remain outstanding, the Company's obligation hereunder, if any, to indemnify its Members or managers, as applicable, is hereby fully subordinated to the Loan and the Loan Documents, and no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity hereunder, if any, shall be payable from amounts allocable to any other Person pursuant to the Loan Documents.

(e)    The foregoing provisions of this Section 17 shall survive any termination of this Agreement.

Section 18.    Assignments.

(a)    Subject to the Loan Documents no Member may sell, transfer, assign or pledge in whole or in part its limited liability company interest in the Company without the consent of all other Members. If a Member proposes to sell, assign or transfer its interest (for purposes hereof, the "Selling Member"), then each other Member shall have the right in its discretion to (i)

participate in such transaction and sell, transfer or assign its interest on the same terms and conditions as the Selling Member, (ii) withhold its consent to such transaction or (iii) consent to the transaction and not participate therein. Any approved transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

(b)    For so long as the Loan shall remain outstanding, the Company shall not allow transfers of direct or indirect ownership interests in or control rights over the Company that would violate the provisions of the Loan Agreement.

Section 19.    Admission of Additional Members.

Subject to Schedule C attached hereto, one or more additional Members of the Company may be admitted to the Company from time to time with the written consent of all Members.

Section 20.    Dissolution.

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee, or (ii) the resignation of the Member and the admission of an additional member of the Company), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of such member in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or a Special Member shall not cause the Member or Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Members in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

(e)     For so long as the Loan shall remain outstanding and to the fullest extent permitted by law, the Company and its Members hereby waive their right to dissolve or terminate (and waive their right to consent to the dissolution or termination of) the Company or this Agreement, and shall not take any action towards that end, except upon the express prior written consent of Lender.

Section 21.     Waiver of Partition; Nature of Interest.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Members irrevocably waives any right or power that such Person might have to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Members shall not have any interest in any specific assets of the Company, and the Members shall not have the status of a creditor with respect to any distribution pursuant to the terms hereof. The interest of each Member in the Company shall be personal property.

Section 22.     Benefits of Agreement; No Third-Party Rights.

Except for Sections 5(c), 7, 9, 17, 18, 19, and Schedule C attached hereto, with respect to the Lender, none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Members. Except with respect to the Lender as set forth above, nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons).

Section 23.     Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 24.     Entire Agreement.

Subject to Schedule C attached hereto, this Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 25.     Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

Section 26.   Amendments.

This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by all Members.

Section 27.   Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 28.   Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission at the addresses set forth in Schedule B attached hereto, or at such other address as may be designated by written notice to the other parties.

Section 29.   Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member, in accordance with its terms.

Section 30.   Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the date hereof.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 13ᵗʰ day of September, 2013.

CHICAGO SOUTH LOOP HOTEL,
LLC, an Illinois limited liability company

By: _Louis P. Dodd_
Louis P. Dodd, Manager

By: _Vickie White_
Vickie White, Manager

SPRINGING MEMBER/SPECIAL
MEMBER:

_____
Brian McCarthy

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 23rd day of October, 2013.

CHICAGO SOUTH LOOP HOTEL,
LLC, an Illinois limited liability company

By: _____
　　　Louis P. Dodd, Manager

By: _____
　　　Vickie White, Manager

SPRINGING MEMBER/SPECIAL
MEMBER:

Brian McCarthy

SCHEDULE A

Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Affiliate" shall mean, as to any Person, any other Person that (i) directly or indirectly, owns ten percent (10%) or more of legal, beneficial or economic interests in such Person, (ii) is in control of, is controlled by or is under common ownership or control with such Person, (iii) is a director or officer of such Person or of an Affiliate of such Person and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"Agreement" means this Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware, as amended or amended and restated from time to time.

"Company" means CHICAGO SOUTH LOOP HOTEL OWNER, LLC, a Delaware limited liability company.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Covered Persons" has the meaning set forth in Section 17(a).

"Member" means the member(s) set forth in this Agreement, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, that the term "Member" shall not include the Special Members or Springing Members.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), a person acting as a Springing Member, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"Springing Member" means a Person who is not a Member, but who has executed this Agreement in order that, upon the occurrence of the conditions set forth in Section 5(c), such Person can be admitted to the Company as the Special Member in order that the Company at all times has at least one member.

[no further text on this page]

SCHEDULE E

Member

| Name | Mailing Address | Initial Contribution | Limited Liability Company Interest |
|---|---|---|---|
| Chicago South Loop Hotel, LLC | 2600 South State Street, Chicago,, IL 60616 | $1.00 | 100% |

## SCHEDULE C

For purposes of this Schedule C, any capitalized but undefined term herein has the meaning set forth in that certain Mortgage and Security Agreement, dated as of the date hereof, by and between Morgan Stanley Mortgage Capital Holdings LLC, as lender, and the Company, as borrower, and Lender is a third party beneficiary of this Schedule C.

Notwithstanding anything to the contrary contained in this Agreement, for so long as the Loan remains outstanding, the Company has not and will not:

(a)    engage in any business other than the ownership, management and operation of the Property and the Company will conduct and operate its business as presently conducted and operated;

(b)    enter into any contract or agreement with any affiliate of the Company, any constituent party of the Company or any affiliate of any constituent party, except upon terms and conditions that are intrinsically fair, commercially reasonable, and no less favorable to it than would be available on an arms-length basis with third parties other than any such party;

(c)    incur any indebtedness other than (i) the Debt (as defined in the Loan Documents), and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding two percent (2%) of the original principal amount of the Loan at any one time; provided that any indebtedness incurred pursuant to subclause (ii) shall be (A) outstanding not more than sixty (60) days, and (B) incurred in the ordinary course of business (the indebtedness described in the foregoing clauses (i) and (ii) is referred to herein, collectively, as "Permitted Indebtedness"). No Indebtedness other than the Debt may be secured (senior, subordinate or *pari passu*) by the Property;

(d)    make any loans or advances to any third party (including any affiliate or constituent party), and has not and shall not acquire obligations or securities of its affiliates;

(e)    fail to remain solvent and the Company has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, provided there is enough income from the Property to do so;

(f)    fail to do all things necessary to observe organizational formalities and preserve its existence, and the Company has not and will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless (A) Lender has consented and (B) following a securitization of the Loan, the applicable rating agencies have issued a rating agency confirmation in connection therewith, amend, modify or otherwise change the Agreement;

(g)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any other person. The Company's assets will not be listed as assets on the financial statement of any other person, provided, however, that the Company's assets may be included in a consolidated financial statement of its affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of the Company and such affiliates and to indicate that the Company's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other person, and (ii) such assets shall be listed on the Company's own separate balance sheet. The Company will file its own tax returns (to the extent the Company is required to file any such tax returns) and will not file a consolidated federal income tax return with any other person. The Company has maintained and shall maintain its books, records, resolutions and agreements as official records;

(h)    fail to hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of the Company or any constituent party of the Company), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, fail to identify itself or any of its affiliates as a division or department or part of the other and shall maintain and utilize separate stationery, invoices and checks bearing its own name;

(i)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(j)    seek or effect the liquidation, dissolution (to the fullest extent permitted by law), winding up, consolidation, asset sale or merger, in whole or in part, of the Company;

(k)    commingle the funds and other assets of the Company with those of any affiliate or constituent party or any other person, and has held and will hold all of its assets in its own name;

(l)    fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party or any other person;

(m)    assume or guarantee or become obligated for the debts of any other person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other person;

(p)    fail to pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations;

(q)    fail to compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred;

(r)    without the unanimous consent of all of its Members, will not (i) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (ii) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of the Company's properties, (iii) make any assignment for the benefit of the Company's creditors, or (iv) take any action that might cause the Company to become insolvent;

(s)    fail to maintain an arm's-length relationship with its affiliates;

(t)    fail to allocate fairly and reasonably any overhead expenses that are shared with any affiliate, including shared office space;

(u)    except in connection with the Loan, pledge its assets for the benefit of any other person;

(v)    have any obligation to indemnify its officers or Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(w)    (A) to the fullest extent permitted by law, dissolve, merge, liquidate, consolidate; (B) sell, transfer, dispose, or encumber (except with respect to the Loan Documents) all or substantially all of its assets or acquire all or substantially all of the assets of any Person; or (C) engage in any other business activity, or amend its organizational documents with respect to the matters set forth herein without the consent of the Lender;

(x)    to the fullest extent permitted by law; including Section 18-1101 (c) of the Act, fail to consider the interests of the Company's creditors, including Lender, in connection with all limited liability actions; and

(y)    have any of its obligations guaranteed by any affiliate and failure of the Company, or the Member on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member.

4837-7008-1301, v. 1

ANNEX 3

Resolutions

The Resolutions of the Company follow this cover page.

ANNEX 3, Resolutions – Cover Page
(CHICAGO SOUTH LOOP HOTEL OWNER, LLC)
18349-235/Chicago South Loop Hotel

ANNEX 3

Resolutions

RESOLVED, that any Manager (the "Authorized Party") of CHICAGO SOUTH LOOP HOTEL, LLC, an Illinois limited liability company, the sole member of CHICAGO SOUTH LOOP HOTEL OWNER, LLC, a Delaware limited liability company (the "Company"), or his duly appointed attorney-in-fact, be, and he is hereby, authorized and directed to do any and all things deemed necessary or advisable and in the best interest of the Company in connection with obtaining a loan (the "Loan") from MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, a New York limited liability company ("Lender"), in the approximate amount of $6,800,000.00 (or such other amount as may be approved by the Authorized Party), and any and all extensions, rearrangements or renewals thereof, which loan shall be secured by a lien covering that certain tract of land, which is improved with a hotel and related amenities located in Chicago, Cook County, Illinois and more particularly described on Exhibit A attached hereto and made a part hereof for all purposes (the land and improvements located thereon shall be collectively referred to as the "Property");

FURTHER RESOLVED, that the aforesaid Authorized Party of the Company be, and he is hereby authorized and directed to execute and deliver appropriate loan instruments in the name of the Company in favor of the Lender to secure the Loan; and to execute and deliver appropriate instruments of mortgage and deed of trust covering the Property and any and all other property of whatever kind or character owned by the Company and to execute and deliver all instruments, documents, certificates and agreements in this connection required by Lender;

FURTHER RESOLVED, that the Authorized Party of the Company is hereby authorized to (a) sign, execute, certify to, verify and acknowledge, deliver, accept, file and record any and all instruments and documents, and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Company, as, in any such Authorized Party's judgment, is necessary, desirable or appropriate in order to consummate the transactions contemplated by or otherwise to effect the purposes of the foregoing resolutions;

FURTHER RESOLVED, that all actions heretofore taken by the Authorized Party of the Company and all things done by such person's authority with respect to the obtainment of the Loan be, and the same are, hereby ratified and approved;

FURTHER RESOLVED, that the transactions contemplated by the foregoing resolutions are reasonably expected to benefit the Company, both directly and indirectly.

EXHIBIT A

Legal Description

Street Address: 11 West 26th Street, Chicago, Illinois 60616

PARCEL 1:

LOTS 2 TO 11, BOTH INCLUSIVE, (EXCEPT THE NORTH 33 FEET OF LOTS 6 TO 11 BOTH
INCLUSIVE, TAKEN FOR 26TH STREET) IN COUNTY CLERK'S DIVISION OF UNSUBDIVIDED
LAND IN THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 28, TOWNSHIP 39
NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS, ALSO THAT PART OF THE WEST 26TH PLACE SOUTH OF AND ADJOINING SAID
LOTS LYING EAST OF THE SOUTHERLY EXTENSION OF THE WEST LINE OF SAID LOT 11
AND LYING WEST OF A LINE DRAWN FROM THE SOUTHEAST CORNER OF LOT 5 IN
COUNTY CLERK'S DIVISION TO THE NORTHEAST CORNER OF LOT 1 IN BLOCK 1 IN THE
SUBDIVISION OF LOTS 44 TO 71, BOTH INCLUSIVE, IN ADAMS'S SUBDIVISION OF PART OF
THE EAST 1/2 OF THE SOUTHEAST 1/4 OF SECTION 28, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

LOTS 1 TO 5, BOTH INCLUSIVE, (EXCEPT THE NORTH 33 FEET TAKEN FOR 26TH STREET)
IN W. H. ADAM'S SUBDIVISION OF PART OF THE EAST 1/2 OF THE SOUTHEAST 1/4 OF
SECTION 28, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN,
ALSO LOTS 12 TO 15 BOTH INCLUSIVE (EXCEPT THE NORTH 33 FEET TAKEN FOR 26TH
STREET) IN COUNTY CLERK'S DIVISION OF UNSUBDIVIDED LAND IN THE NORTHEAST 1/4
OF THE SOUTHEAST 1/4 OF SECTION 28; ALSO THAT PART OF WEST 26TH PLACE LYING
SOUTH OF THE SOUTH LINE OF SAID LOTS 1 TO 5, BOTH INCLUSIVE, AND SAID SOUTH
LINE EXTENDED EAST LYING NORTH OF A LINE DRAWN 30.0 FEET SOUTH OF AND
PARALLEL WITH THE SOUTH LINE AND ITS EASTERLY EXTENSION LYING EAST OF THE
SOUTHERLY EXTENSION OF THE WEST LINE OF LOT 5 AND LYING WEST OF THE
SOUTHERLY EXTENSION OF THE EAST LINE OF LOT 12, ALL IN COOK COUNTY, ILLINOIS.

PARCEL 3:

1, 2, 3, 18, 19 AND 20 IN BLOCK 1 IN THE SUBDIVISION OF LOTS 44 TO 71, BOTH INCLUSIVE,
EXCEPTING FROM LOTS 19 AND 20 THAT PART THEREOF LYING WEST OF THE
SOUTHERLY EXTENSION OF THE WEST LINE OF LOT 11 IN COUNTY CLERK'S DIVISION
AND LYING NORTH OF A LINE DRAWN 39.886 FEET SOUTH OF AND PARALLEL WITH THE
NORTH LINE OF SAID LOT 20, ALSO THAT PART OF THE NORTH AND SOUTH 16 FOOT
ALLEY IN BLOCK 1 IN THE SUBDIVISION OF LOTS 44 TO 71 INCLUSIVE, LYING NORTH OF
THE WESTERLY EXTENSION OF THE SOUTH LINE OF LOT 3 IN SAID BLOCK 1, IN COOK
COUNTY, ILLINOIS.

PIN: 17-28-407-007-0000, 17-28-407-012-0000, 17-28-409-006-0000, and 17-28-410-014-0000

EXHIBIT A, Legal Description - Solo Page
(CHICAGO SOUTH LOOP HOTEL OWNER, LLC)
18349-235/Chicago South Loop Hotel

## ANNEX 4

### Certificate of Good Standing/Certificate of Existence

The Certificate of Good Standing/Certificate of Existence (from the state of incorporation)
for the Company follows this cover page.

ANNEX 4, Certificate of Good Standing/Certificate of Existence - Cover Page
(CHICAGO SOUTH LOOP HOTEL OWNER, LLC)
18349-235/Chicago South Loop Hotel



PAGE 1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "CHICAGO SOUTH LOOP HOTEL OWNER,
LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND
IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-SECOND DAY OF
OCTOBER, A.D. 2013.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CHICAGO SOUTH
LOOP HOTEL OWNER, LLC" WAS FORMED ON THE FOURTEENTH DAY OF
AUGUST, A.D. 2013.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE
NOT BEEN ASSESSED TO DATE.

5383414    8300

131219957

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0831202

DATE: 10-22-13

ANNEX 5

Certificate of Authority to Transact Business and
Certificate of Account Status or Good Standing

The Certificate of Authority to Transact Business and
Certificate of Account Status or Good Standing from state in which
property located, if different from state of incorporation follows this cover page.

6110475v.3

ANNEX 5, Certificate of Authority to Transact Business and
Certificate of Account Status or Good Standing- Cover Page
(CHICAGO SOUTH LOOP HOTEL OWNER, LLC)
18349-235/Chicago South Loop Hotel

File Number        0441720-8



## To all to whom these Presents Shall Come, Greeting:

I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that

CHICAGO SOUTH LOOP HOTEL OWNER, LLC, A DELAWARE LIMITED LIABILITY COMPANY HAVING OBTAINED ADMISSION TO TRANSACT BUSINESS IN ILLINOIS ON AUGUST 15, 2013, APPEARS TO HAVE COMPLIED WITH ALL PROVISIONS OF THE LIMITED LIABILITY COMPANY ACT OF THIS STATE, AND AS OF THIS DATE IS IN GOOD STANDING AS A FOREIGN LIMITED LIABILITY COMPANY ADMITTED TO TRANSACT BUSINESS IN THE STATE OF ILLINOIS.



*In Testimony Whereof,* I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this    22ND
day of        OCTOBER        A.D.        2013        .

*Jesse White*

SECRETARY OF STATE

Authentication #: 1329500850
Authenticate at: http://www.cyberdriveillinois.com

# EXHIBIT B

FILED FILED DATE: 9/23/2019 1:33 PM 2019CH10966
DATE: 3/11/2019 7:38 PM 2019L002607

# OPERATING AGREEMENT FOR
# CHICAGO SOUTH LOOP HOTEL, LLC

THIS OPERATING AGREEMENT (these "Articles") is made as of the 1st day of January 2007, by and among the signatories identified on the signature pages hereto.

IN CONSIDERATION OF the mutual promises of the parties hereto and other good and valuable consideration, receipt and adequacy of which is hereby acknowledged, it is mutually agreed by and between the parties hereto as follows:

## 1. NAME

The name of the limited liability company shall be "CHICAGO SOUTH LOOP HOTEL, LLC".

## 2. PURPOSE

The purpose for which the limited liability company is formed is to transact any or all lawful business for which limited liability companies may be organized under the Illinois Limited Company Act.

## 3. REGISTERED OFFICE AND AGENT

The name of the registered agent of the limited liability company shall be Louis Dodd. The registered office of the limited liability company shall be located at 2600 S. State Street, Chicago, Illinois 60616.

## 4. FILING OF ARTICLES OF ORGANIZATION

The members of the limited liability company shall:

(a) promptly file a duly executed original copy of the Articles of Organization of the limited liability company, together with one or more additional copies thereof as appropriate, with the Secretary of State of Illinois (the "Secretary") and in such other place or places as may be required by law; and

(b) tender and pay all fees, charges and do all other things requisite for the due formation of the limited liability company pursuant to the laws of the State of Illinois.

## 5. TERM

The limited liability company shall be deemed formed at the time of the filing of the Articles of Organization with the Secretary and shall continue perpetually, unless sooner terminated pursuant to the further provisions of these Articles.

24

FILED FILED DATE: 9/23/2019 1:33 PM 2019CH10966
FILED DATE: 3/11/2019 7:38 PM 2019L002607

## 6. INTERESTS AND CONTRIBUTIONS OF MEMBERS

6.1 The name and present mailing address of each member and the percentage interest of each member of the limited liability company are set forth on Schedule 1 hereto. The total amount of cash constituting the initial aggregate contribution by the members is One Thousand and no/100ths Dollars ($1,000.00).

6.2 The initial contribution of each member shall be contributed to the limited liability company upon execution of these Articles by such member.

6.3 An individual capital amount shall be maintained for each member. The capital account of each member shall consist of such member's initial contribution, increased by:

  (a) additional contributions made by such member, and

  (b) such member's share of the limited liability company's net profits, and decreased by:

    (i) distributions made to such member, and

    (ii) such member's share of the limited liability company's losses,

all in accordance with any applicable provision of the Internal Revenue Code of 1986 as amended (the "Code"), or any rule or regulation thereunder.

6.4 No additional contributions have been agreed to as of the date of these articles, and none shall be required or permitted without the unanimous written consent of all the members.

6.5 Except as set forth in Article 13.3, a member shall not receive from the limited liability company any part or all of his or her contribution to capital until:

  (a) all liabilities of the limited liability company, except liabilities to members on account of their contributions to capital, have been paid or there remains property of the limited liability company sufficient to pay them;

  (b) the consent of all members is had, unless the return of the contribution to capital may be rightfully demanded as provided herein; and

2

25

FILED DATE: 9/23/2019 1:33 PM 2019CH10966
FILED DATE: 9/11/2019 7:38 PM 2019Loo2803

○ the Articles of Organization or these Articles are cancelled or so amended as to set out the withdrawal or reduction of the contributions of capital.

6.6  Subject to the provisions of Article 6.5, a member may rightfully demand the return of his or her contribution only upon the dissolution of the limited liability company.

6.7  The limited liability company shall have the discretion to distribute cash, notes, property or a combination thereof to a member in return for his or her contribution to capital as it deems appropriate.

6.8  A member of the limited liability company may have the limited liability company dissolved and its affairs wound up when:

(a)  the member rightfully but unsuccessfully has demanded the return of his or her contribution to capital; or

(b)  the other liabilities of the limited liability company have not been paid, or the limited liability company's property is insufficient for their payment and the member would otherwise be entitled to the return of his or her contribution.

## 7.  ALLOCATION OF PROFITS AND LOSSES

7.1  For purposes of these Articles and until determined otherwise by the manager of the limited liability company, in such manager's sole discretion, the term "fiscal year" shall mean the calendar year

7.2  The profits and losses of the limited liability company shall be determined for each fiscal year of the limited liability company in accordance with the accounting methods followed for federal income tax purposes and otherwise in accordance with generally accepted accounting principles and procedures applied in a consistent manner and shall be deemed to have been earned ratably during the fiscal year.  For purposes of Section 702 and 704 of the Code or the corresponding sections of any future internal revenue law or any similar tax law of any state or jurisdiction, and for such purposes only, the determination of each member's distributive share of all items of income, gain, deduction, loss, credit or allowance for any period or year shall be made in proportion to the amounts of the members' respective percentage interests in the limited liability company during such period or year.

7.3  The profits of the limited liability company shall be shared among the members, and the losses of the limited liability company shall be borne by the members in proportion to each member's respective percentage interest in the limited liability company.

3

26

FILED DATE: 9/11/2019 9:33 PM  2019CH10966
FILED DATE: 9/23/2019 1:33 PM  2019Ch00280?

## 8.  DISTRIBUTIONS

8.1  To the fullest extent allowed by the Illinois Limited Liability Company Act (the "Act"), the Net Cash Flow, if any, of the limited liability company shall be distributed at least annually among the members in proportion to each member's respective percentage interest in the limited liability company.  For such purpose, "Net Cash Flow" shall mean:

(a)  For each calendar year, all cash income and receipts of whatsoever nature or kind received to the limited liability company less all costs and expenses incurred or paid by, and all net additions to reserves of the limited liability company (whether operating or capital costs, and including without limitation, all costs to acquire its interest in the real property described in Article 3, payments upon the principal of any indebtedness , secured or unsecured, of the limited liability company, expenditures for capital improvement, additions or replacements and any other expenditures which are not deductible in arriving at the limited liability company's federal taxable income, such as expenses for repairs and reserves to meet anticipated expenses as the manager shall deem to be reasonably necessary); plus

(b)  Any other funds deemed by the manager to be available for distribution.

8.2  The net proceeds from the sale of all or any portion of any real property o ` the limited liability company shall be distributed to the members in proportion to each member's respective percentage in the limited liability company.

## 9.  DESIGNATION OF MANAGER

9.1  For the purpose of conducting the business and affairs of the limited liability company, Louis Dodd, shall act as co-manager until the first annual meeting of the members or until his successor is elected and qualifies.  The address of the manager is as follows: 2600 S. State Street, Chicago, Illinois 60616.

9.2  The manager of the limited liability company shall be elected annually at a meeting of the members or by other action of the members to be held or taken on each annual anniversary of the date of these Articles, or as soon thereafter as such meeting or action can be held or taken.  Such person who receives the unanimous approval of the members of the limited liability company shall be elected manager, and the Articles of Organization shall be amended to any extent required under the Act.  The number of managers may be increased or decreased as determined also by the unanimous consent of the members of the limited liability company.

4

37

FILED DATE: 3/1/2019 7:38 PM 2019CH10966
FILED DATE: 9/23/2018 1:33 PM 2019Ch10966

9.3  Whenever the consent of approval of the members is referred to in these Articles, the consent or approval by sufficient members authorized to make such a decision shall be effective whether votes are cast at a meeting of members (and whether or not all of the members are in attendance at such meeting), or by formal or informal, oral or written instructions of such members, or otherwise, and such determination so made by the members, regardless of the number of members who may actually vote or otherwise participate therein.

## 10. RIGHTS AND POWERS OF THE MANAGER

10.1  The manager shall have sole and complete control of the management and operation of the affairs and business of the limited liability company and shall operate the limited liability company for the benefit of all of the members. One of the signatures of the manager shall be sufficient to bind the limited liability company (so long as such signatory has the consent thereto of the other managers, if there is more than one manager).

10.2  The manager (acting for and on behalf and at the expense of the limited liability company), in extension and not in limitation of the rights and powers given by law or by the other provisions of these Articles, shall, in its sole discretion, have full and entire right, power and authority in the management of the business and affairs of the limited liability company:

(a)  to purchase, acquire, own, lease, manage and operate, either directly or indirectly, the real estate described in Article 2 hereof (or any interest or interests therein), and to carry on any and all activities related thereto; and to invest and reinvest any funds or monies of the limited liability company in such property, real, personal, or mixed, as may be consistent with the purposes of the limited liability company set forth in Article 2 hereof;

(b)  subject to the provisions of Article 12.2 hereof, to sell, with or without notice, at public or private sale, and to exchange, trade, transfer, assign, convey, mortgage or otherwise encumber, finance, refinance, lease for any term, pledge, appraise or have appraised, apportion, divide in kind, borrow on, hypothecate or give options for any and all of the property of the limited liability company, whether realty or personal, upon such terms and conditions as the manager, in its sole discretion, may deem to be in the best interests of the limited liability company, and in so doing to execute, acknowledge, seal and deliver all necessary documents or instruments;

5

*28*

FILED FILED DATE: 9/23/2019 1:33 PM 2019CH10966
FILED DATE: 3/11/2019 7:38 PM 2019L002607

(c) to cause the limited liability company to participate in any capacity (whether as stockholder, bondholder, creditor, partner, venturer, member, fiduciary, beneficiary or otherwise) in any business or organization or enterprise, whether incorporated or unincorporated, in any manner or form whatsoever, to the extent consistent with the purposes of the limited liability company set forth in Article 2 hereof;

(d) to employ agents, servants, employees and independent contractors to assist in or assume full responsibility for the management and operation of the business of the limited liability company, including persons related to or affiliated with the manager, and, in each such instance, to pay them reasonable compensation thereof;

(e) to commence or defend litigation with respect to the limited liability company or any of its assets or liabilities; to compromise, settle, arbitrate, or otherwise adjust claims in favor of or against the limited liability company and to insure its assets and undertakings and the manager against any and all risks;

(f) to make loans ad extend credit to the limited liability company; to borrow money from any member, bank, lending institution, and other lender for any purpose of the limited liability company, and in connection therewith, issue notes, debentures or any other evidence of indebtedness and encumber the assets of the limited liability company to secure repayment of borrowed sums; and no member, bank, lending institution or other lender to which application is made for a loan by the manager shall be required to inquire as to the purposes for which such loan is sought, and as between this limited liability company and such member, bank, lending institution or other lender, its shall be conclusively presumed that the proceeds of such loan are to be and will be used for the purposes authorized under these Articles; and to obtain replacement or refinancing of any indebtedness or security therefore with respect to any property of the limited liability company, or to repay the same in whole or in part and whether or not a prepayment penalty may be incurred;

(g) to own, improve, develop, operate, manage and lease the real estate described in Article 3 hereof; to construct, alter, improve, demolish or repair buildings, structures or other improvements on such real estate; to settle boundary lines and to grant and reserve easements, covenants, rights-of-way and other rights or privileges with respect to such real estate; and to partition and to join with co-owners and others in dealing with such real estate in any way;

6

29

FILED FILED DATE: 9/23/2019 1:33 PM 2019CH10966
FILED DATE: 3/11/2019 7:38 PM 2019L002607

(h) to make such elections under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit, and as to all other relevant matters, as the manager, in its sole discretion, deem necessary or desirable; and

(i) to make investments in government obligations, bank certificates of deposits, short-term debt securities, and short-term commercial paper, pending initial investment or future investment of the funds of the limited liability company, and to provide a source from which to meet contingencies.

10.3  To the extent permitted by the Act, all powers of the manager hereunder may be exercised by it, and by any or all such powers may be assigned or delegated by the manager to any other person or persons, including the other members of the limited liability company and other persons and entities related to or affiliated with the manager.

10.4  In addition to the specific rights and powers herein granted to the manager, the manager shall possess and may enjoy and exercise all the rights and powers of manager as provided in the Act.

10.5  The manager or its delegate(s), as the case may be, shall devote such of their time to the business of the limited liability company as they may, in their sole discretion, deem to be necessary to conduct said business. Any of the members and any manager may engage in or possess an interest in other business ventures of every nature and description, whether or not in competition with the business of the limited liability company, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property; and neither the limited liability company nor the members shall have any right by virtue of these Articles in and to such independent ventures or to the income or profits derived therefrom.

10.6  The limited liability company shall, to the fullest extent permitted by law, indemnify, defend and save harmless the manager and former manager(s) from any and all claims, actions, causes of action, suits, proceedings, losses, damage, liability, costs and expenses (including without limitation, attorneys' fees and expenses, and court costs) asserted against or incurred or sustained by them by reason of any act performed by them while manager or any omission on their part while manager to act for or on behalf of the limited liability company and in furtherance of its interest provided that the manager(s) acted in good faith and in a manner the manager(s) reasonably believed to be in, or not opposed to, the best interest of the limited liability company and, with respect to any criminal action or proceeding, had no reason to believe that their conduct was unlawful.

7

30

FILED DATE: 9/23/2019 1:33 PM   2019CH10966
FILED DATE: 3/11/2019 7:38 PM   2019L002607

10.7  The manager shall not be liable for any mistakes in judgment or for any inadvertent failure to perform any of its obligations hereunder, or for any loss due to such mistake or failure to perform, or due to the negligence, dishonesty, fraud or bad faith of any employee or other agent of the limited liability company.

10.8  The manager, on behalf of the limited liability company, may contract with any person related to or affiliated with the manager, and the manager and such persons related to or affiliated with the limited liability company (including any of the directors, officers or employees of such person), their designees and nominees, shall not be liable to the limited liability company or to any of the members for damages, losses, liability or expenses of any nature whatsoever resulting from mistakes in judgment or any acts or omissions, whether or not disclosed, unless caused by willful misconduct.

10.9  Notwithstanding anything to the contrary contained herein, the manager shall not perform any act on behalf of the limited liability company without the approval of those members who own an aggregate of more than fifty percent (50%) (or 75% in the case of the last sentence of Article 12.2 below) of the total percentage interests of all members of the limited liability company, which approval may be made in writing or at a meeting of the limited liability company in accordance with Article 12.3 below.

10.10  Unless not required by applicable law, the identification "a limited liability company, shall appear after the name of the limited liability company on all correspondence, stationery, checks, invoices and any and all documents and papers executed by the limited liability company.

## 11. LEGAL TITLE TO PROPERTY

Legal title to all or any portion of the property of the limited liability company shall be held in the name of "CHICAGO SOUTH LOOP HOTEL, LLC" or, to the extent allowed by the Act, in such other name as the manager, in its sole discretion, shall determine to be in the best interest of the limited liability company. Without limiting the foregoing grant of authority, to the extent permitted by the Act, the manager may arrange to have title taken and held in its own name or in the names of trustees, nominees or straw parties for the limited liability company. It is expressly understood and agreed that the manner of holding title to the property (or any part thereof) of the limited liability company is solely for the convenience of the limited liability company, and that all such property shall be treated as property of the limited liability company, subject to the terms of these Articles.

*31*

FILED DATE: 9/23/2019 1:33 PM    2019CH10966
FILED DATE: 3/11/2019 7:38 PM    2019L002607

## 12. RIGHTS AND POWERS OF MEMBERS

12.1  With the exception of the manager(s) designated in Article 9 herein and as they shall be so elected from time to time, no member of the limited liability company shall participate in the management of the business and affairs of the limited liability company, except as otherwise provide in these Articles.

12.2  The manager of the limited liability company shall have the authority to amend these Articles provided that any such amendment shall have received the consent of those members whose aggregate percentage interests in the limited liability company exceed fifty percent (50%) of the total percentage interests of all members of the limited liability company and the agreement of a majority in number of the managers. A sale, exchange, lease, mortgage, pledge or other transfer of any substantial assets of the limited liability company shall require consent of members whose aggregate percentage interests in the limited liability company exceed fifty percent (50%) of the total percentage interests of all members of the limited liability company.

12.3  Meetings of the limited liability company for any purpose shall be held at the call of the manager. All such meetings shall be held at a place designated by the manager, and notice of such location and date and time of the meeting shall be given by the manager to each member at least ten (10) days prior to the date (unless such notice is waived to any member, by such member).

12.4  The members of the limited liability company shall have the right and the power to admit additional members upon the unanimous consent of all of the then members.

## 13. TRANSFERABILITY AND REDEMPTION OF INTERESTS

13.1  Except as otherwise provided in this Article 13, none of the members of the limited liability company shall have the right to transfer or assign any part or all of their interest in the limited liability company, and any purported transfer or assignment shall be void and of no force or effect, and may be ignored by the limited liability company and its members. If all members of the limited liability company other than the member proposing to dispose of his or her interest do not approve of the proposed transfer or assignment by unanimous written consent, the transferee of the member's interest shall have no right to participate in the management of the business and affairs of the limited liability company or to become a member. In that event, the transferee shall only be entitled to receive the share of profits or other compensation by way of income and the return of contributions, to which that member otherwise would be entitled.

9

32

FILED DATE: 3/11/2019 7:38 PM 2019CH10966
FILED DATE: 9/23/2019 1:33 PM 2019CH10966

13.2 In the event of an assignment pursuant to this Article 13, the limited liability company shall, upon the unanimous written consent of all remaining members, continue with respect to the remaining members; appropriate adjustments shall be made to their capital accounts and percentage interests to reflect the assignment of the interest of the assignor member; and an election may be made by the manager, in its sole discretion, to adjust the basis of assets of the limited liability company.

13.3 Notwithstanding any provisions of Article 13.1, no transfer or assignment of all or any portion of a member's interest in the limited liability company shall be effective, unless the transferor or assignor delivers to the limited liability company a written opinion of counsel acceptable to the limited liability company, to the effect that:

    (a) such transfer or assignment, when added to the total of all other transfers and assignments of interest in the limited liability company within the preceding twelve (12) months, would not result in the limited liability company being considered to have terminated within the meaning of Section 708 of the Code;

    (b) such transfer or assignment would not violate the Securities Act of 1933, as amended, or any state securities or "Blue Sky" laws applicable to the limited liability company or the interest to be transferred or assigned; and

    (c) such transfer or assignment would not cause the limited liability company to lose its status as a partnership for federal income tax purposes, result in a nonexempt "prohibited transaction" as defined under Section 4975 of the Code, with respect to the limited liability company or any of its managers or members or cause the limited liability company to be subject to registration as an investment company under the Investment Company Act of 1940.

13.4 Each transferor or assignor and each transferee or assignee agrees that it will pay all reasonable expenses, including attorneys' fees, incurred by the limited liability company in connection with a transfer or assignment of all or any portion of such transferor's or assignor's interest in the limited liability company being transferred to such transferee or assignee.

13.5 A person who is the transferee or assignee of all or any portion of the interest of a member as permitted hereby but does not become a substituted member and who desires to make further transfer or assignment of all or any portion of such interest, shall be subject to all of the provisions of this Article 13 to the same extent and in the same manner as any member desiring to make a transfer or assignment of all or any portion of its interest.

*33*

FILED DATE: 9/23/2019 1:33 PM 2019CH10966
FILED DATE: 9/23/2019 1:33 PM 2019CH10966

## 14. DISSOLUTION

14.1  The limited liability company shall be dissolved upon the occurrence of any of the following events:

(a)  when the period fixed for the duration of the limited liability company shall expire;

(b)  by the unanimous agreement of all members, which shall be in writing;

(c)  upon the death, retirement, resignation, expulsion, bankruptcy, court declaration of incompetence with respect to, or dissolution of, a member or the occurrence of any other event that terminates the continued membership of a member in the limited liability company, unless within ninety (90) days after such event there are at least two (2) remaining members and all the remaining members elect to continue the business of the limited liability company by unanimous agreement; or

(d)  upon the occurrence of any other event specified in Section 35-1 of the Act.

14.2  As soon as possible following the occurrence of any of the events specified in this Article effecting the dissolution of the limited liability company, the limited liability company shall execute and file, with the Secretary, articles of dissolution in accordance with the Act and in such form as shall be prescribed by the Secretary.

14.3  Upon a dissolution of the limited liability company, the assets thereof shall be liquidated, and the proceeds therefrom, together with assets distributed in kind to the extent sufficient therefore, shall be applied and distributed in order of priority as follows:

(a)  First, to creditors of the limited liability company, including members who are creditors, in the order of priority provided by law, in satisfaction of liabilities of the limited liability company other than liabilities for distribution to members under the Act.

(b)  Second, to members of the limited liability company in respect of their share of the profits and other compensation by way of income on their contributions; and

(c)  Third, to members of the limited liability company in respect of their contributions to capital.

11

_34_

FILED DATE: 3/12/2019 7:36 PM   2019L002807
FILED DATE: 9/23/2019 1:33 PM   2019CH10966

14.4  The manager of the limited liability company shall not be personally liable for the return or repayment of all or any portion of the contributions of any member; any such return or repayment shall be made solely from assets of the limited liability company.

## 15. BANK ACCOUNTS

The funds of the limited liability company shall be deposited in such bank account or accounts as the manager shall deem appropriate, in its sole discretion, and the manager shall arrange for the appropriate conduct of such accounts. The name "CHICAGO SOUTH LOOP HOTEL, LLC, a limited liability company" shall appear on all bank accounts in which funds of the limited liability company are deposited.

## 16. MISCELLANEOUS PROVISIONS

16.1  Unless otherwise provided in these Articles, no member shall be liable to any other member or to the limited liability company for any good faith act or omission to act in the exercise of his or her judgment under the provisions of these Articles.

16.2  Nothing herein contained shall be construed to constitute any member hereof the agent of any other member or to limit in any manner the members in the carrying on of their own respective business or activities.

16.3  The use of any gender herein shall be deemed to be or include the other genders, and the use of the singular herein shall be deemed to be or include the plural (and vice versa), wherever appropriate. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of these Articles, or the intent of any provisions thereof.

16.4  These Articles set forth all ( and are intended by all parties hereto to be an integration of all) of the covenants, promises, agreements, warranties and representations among the parties hereto with respect to the limited liability company, the business of the limited liability company and the property of the limited liability company, and there are no covenants, promises, agreements, warranties or representations, oral and written, express or implied, among them other than as set forth herein.

16.5  Nothing contained in these Articles shall be construed as requiring the commission by any person of any act contrary to applicable law, including, without limitation, Section 4975 of the Code (to the extent applicable). Wherever there is any conflict between any provision of these Articles and any statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such manner that the

12

35

FILED DATE: 9/23/2019 1:33 PM    2019CH10966
FILED DATE: 3/11/2019 7:38 PM    2019L002607

provision(s) of these Articles thus affected shall be curtailed and limited only
to the extent necessary to conform with said requirement of law. In the event
that any part, section, paragraph or clause of these Articles shall be held to be
indefinite, invalid or otherwise unenforceable, the entire Articles shall not fail
on account thereof and the balance of the Articles shall continue in full force
and effect.

16.6 The limited liability company shall indemnify, defend and save harmless
each member or former member of the limited liability company against
expenses actually and reasonably incurred by him, her or it in connection
with the defense of an action, suit or proceeding, civil or criminal, in which
he, she or it is made a party by reason of being or have been such member,
except in relation to matters as to which he, she or it shall be adjudged in the
action, suit or proceeding to be liable for gross negligence or willful
misconduct.

## 17. GOVERNING LAW

It is the intention of the parties hereto that these Articles shall be governed by and
construed and enforced in accordance with the internal laws of the State of Illinois.

## 18. BURDEN AND BENEFIT

These Articles are binding upon and shall inure to the benefit of the parties hereto
and their respective heirs, guardians, executors, administrators, personal and legal
representatives, and successors and to the assigns of the parties hereto to the extent,
but only to the extent, the same is provided for in accordance with, and permitted by,
the provisions of these Articles.

## 19. NOTICES

Except as otherwise provided in these Articles, any notice, consent or other
communication required or permitted hereunder shall be in writing and shall be
addressed, in the case of the limited liability company, to its principal place of
business specified in Article 2, in the case of the manager, to its office at the location
specified in Article 9.1, and, in the case of any member, to its address set forth
opposite its signature below, as specified on or to such other address or person as any
of the foregoing parties shall furnish to the other parties in writing; and any such
communication so addressed shall be deemed to have been given when delivered by
hand or on the earlier of actual receipt and three (3) business days after being sent by
registered or certified mail, postage prepaid, return receipt requested, or one (1)
business day after being sent by overnight courier, telegram, or cable or on actual
receipt after being sent by any means not specified herein.

36

FILED DATE: 9/23/2019 1:33 PM   2019CH10966
FILED DATE: 3/11/2019 7:38 PM   2019L002607



IN WITNESS WHEREOF, the parties have executed these Articles as of the day and year first above written

CO-MANAGERS:

_____ Co-Manager
Louis Dodd
Address:    8740 Grant Street
            Burr Ridge, IL 60521

_____ Co-Manager
James D. White
Address:    2913 Balmoral
            Flossmoor, IL 60422

_____ Co-Manager
Floyd Mix
Address:    237 W. 95ᵗʰ Street
            Chicago, IL 60628

_____ Co-Manager
Jerry Cooper
Address:    2121 S. Michigan Avenue
            Chicago, IL 60616

37

# EXHIBIT C

07/04/2013 21:38 FAX 708 788 8888          LOUIS SICILIANO                          ☒002/002

## Resolution Of Members Of Chicago South Loop Hotel

Be it resolved by the Members of the Chicago South Loop Hotel, LLC that:

1. The Written Consent And Resolution Of Members Of Chicago South Loop Hotel. LLC dated June 25, 2013, is hereby rescinded, cancelled and held for naught;

2. Vickie O. White and Louis P. Dodd, each having a 42.5 per cent interest in the Company, have equal input into decisions made affecting the Company, and they shall concur in any policy change affecting the Company;

3. All expenditures of the Company, which exceed $ 5,000.00, shall be reviewed and approved by all Members.

4. Louis P. Dodd shall be the contact person for the Company.

July 5, 2013

*[signatures]*

Vickie O. White

Louis P. Dodd

Floyd Mix, M.D.S

Jerry Cooper

FILED DATE: 8/23/2019 1:33 PM 2019CH10896
FILED DATE: 8/23/2019 1:33 PM 2019CH002607

# EXHIBIT D

EXHIBIT
2

FILED DATE: 3/11/2019 7:33 PM   2019L002607

## Restrictive Stock Agreement
## Chicago South Loop Hotel, LLC

This Agreement (hereinafter called the "Agreement") is made as of the 14th day of March, 2007 by and between James D. White, Louis P. Dodd, Floyd Mix, D.D.S. and Jerry Cooper (hereinafter collectively called the "Members", and individually called a "Member") and Chicago South Loop Hotel, LLC, an Illinois limited liability company (hereinafter called the "Company").

### Recital

The Members are the owners of all of the issued and outstanding stock of the Company. The Members and the Company wish to further the interests of the Company by imposing the restrictions and obligations set forth hereinafter with respect to the stock (hereinafter called the "Shares"), and to that end the Members and the Company agree as follows:

### Section 1
### *General Restriction on Transfer: Right of First Refusal.*

Except for dispositions under Section 2 below, no Member shall sell or otherwise transfer or dispose of any Shares now owned or hereafter acquired by him unless the following conditions shall have been complied with:

(a)    The transferring Member shall give the Company and each other Member written notice of the terms (including the number of shares to be transferred, the price per share and the name of the proposed transferee) on which he proposes to transfer his Shares.

(b)    Within 60 days after the receipt of such notice, the Company shall have the right and option (to be exercised, if at all, by written notice to the selling Member and all other Members, and by tendering to the selling Member the Purchase Price (as defined in Subparagraph (e) below) for the Shares, to purchase all, but not less than all, of the Shares which the transferring Member proposes to sell.

(c)    If the Company has not exercised its right to purchase within the 60-day period, the Company shall, as soon as practicable thereafter, give each of the other Members written notice of its non-exercise and the other Members shall have the right (to be exercised, if at all, as stated below and within 30 days after receipt of such notice of non-exercise from the Company) to purchase in the aggregate all, but not less than all, of the Shares which the selling Member proposes to sell at the Purchase Price therefore. Such other Members, individually or as a group, shall exercise their right by giving written notice thereof to the selling Member, to the Company and to all of the other Members. The notice of each exercising Member shall state the number of shares which he is willing to purchase. If there is an oversubscription by the Members, the Shares to be sold shall, to the extent required to eliminate the oversubscription, be allocated among the exercising Members in the proportion of the number of Shares which each of them then

1

owns. Each exercising Member shall, within ten days after giving notice of his exercise of the right to purchase, tender to the selling Member the Purchase Price for the Shares covered by such notice or such lesser amount of Shares as may have resulted from an oversubscription and allocation as hereinabove provided. If any exercising Member shall fail to make such tender of the Purchase Price, the selling Member shall promptly notify the other exercising Members of such failure, and such other Members shall have the right (to be exercised by tendering to the selling Member, within five days after the receipt of such notice, the Purchase Price for the Shares, as to which the failure to tender occurred) to purchase *pro rata* the Shares to which the failure occurred.

(d)    If all the Shares which the selling Member proposes to sell are not purchased by the Company or the other Members respectively, in accordance with Subparagraphs (b) and (c) above, the selling Member may make a bona fide transfer of all of the Shares to the prospective purchaser named, and upon the other terms stated, in his notice of proposed sale. If the selling Member shall fail to make such sale within 30 days following the expiration of the time provided in Subparagraph (c) above for the exercise of the right to purchase by other Members, the right of the selling Member to make the proposed sale shall terminate.

(e)    If the Company or the Members exercise its or their right to purchase Shares under this Section 1, the Purchase Price of the Shares shall be established by one of the following ways:

(i)    As agreed upon by the parties; or

(ii)    If the hotel building presently under construction is not completed and in operation on the date of the notice given by the selling Member under Section 1 (a) above, the Purchase Price per Share shall be established by adding the value of the land ($4,600,000.00), the sums paid by the Company as of that date for the costs of construction, including, but not by way of limitation, labor performed, materials furnished, and other construction-related expenses, and the costs of the furnishing of the hotel, if any. The total shall then be divided by 4,333.33, being the number of issued and outstanding Shares. A factor of 20 per cent shall be added to this figure to set the Purchase Price per Share. The Purchase Price shall be paid in cash; or

(iii)    If the hotel building is completed and the hotel is in operation on the date of the notice given by the selling Member under Section 1 (a) above, the Purchase Price per Share shall be established by appraisal. The parties shall select an appraiser from the list of appraisers of the Member Appraisal Institute, who    shall    submit a written appraisal of the fair market value of the hotel as an operating entity. If either party is not satisfied with the appraisal, the parties shall    select a second appraiser from the list of appraisers of the Member Appraisal Institute, who will perform a formal clinical review of the appraisal, which shall be binding on the parties. The costs of the appraisal and the formal

FILED DATE: 3/11/2019 7:33 PM    2019L002607

2

FILED DATE: 3/11/2019 7:33 PM   2019L002607

clinical review, if any, shall be shared by the parties. The appraised value or the appraised value after review shall then be divided by 4,333.33, being the number of issued and outstanding Shares, to determine the Purchase Price per Share. The per-Share value shall not be less than the per-Share value established in the manner described in Section 1(e)(ii) above. The Purchase Price shall be paid in cash.

## Section 2

Each person to whom the Company may, after the date hereof, issue Shares, and each transferee of Shares after the date hereof, shall as a condition to such issuance or the effectiveness of such transfer be required to execute a written Consent of his agreement to be bound by all of the terms and conditions of this Agreement in substantially the form of the Consent attached hereto as Exhibit "A". The Company shall not issue or transfer any Shares until it has received an executed Consent from the person to whom such Shares are to be issued or transferred. Upon the Company's receipt of such Consent and thereafter, the terms "Member" and "Members," as used herein, shall include the person to whom the Shares have been issued or transferred, and the term "Shares" shall include the shares of the stock of the Company issued or transferred.

## Section 3
### *Inability of the Company Lawfully to Purchase Shares*

The Company's obligation to purchase Shares pursuant to Section 1 of this Agreement is subject to all applicable rules of law. If at any time the Company does not have the right lawfully to purchase all of the Shares which the Company is then obligated to purchase under this Agreement, the following rules will apply:

(a)    If, at the time in question, the Company is obligated to purchase Shares held by more than one person, the Company shall purchase as many Shares as it may lawfully purchase, and shall allocate its purchases among the persons from whom it is obligated to purchase in the same ratio as the total number of Shares at that time held by each such person bears to the total number of Shares at that time held by all such persons; and

(b)    The inability of the Company at any time or from time-to-time lawfully to purchase or to pay for all Shares which it is obligated to purchase under this Agreement shall not relieve the Company of the obligation to make such purchase or payment in accordance with this Agreement as promptly as practicable after the Company is able to lawfully make such purchase or payment.

## Section 4
### *Stock Certificates*

Every certificate representing Shares of the Company shall bear, in a conspicuous manner, the following legend:

3

FILED DATE: 3/11/2019 7:33 PM   2019L002607

"The sale or transfer by any means of the Shares represented by this certificate is restricted by, and is subject to, the terms of an Agreement dated February 9, 2007, between the Company and the Members of the Company. A copy of the Agreement is on file, and available for inspection by the owner of the Shares represented hereby, at the principal offices of the Company,"

or such other legend or notice as in the opinion of counsel for the Company is or becomes from time-to-time necessary or desirable for the purpose of effectuating the terms of this Agreement.

## Section 5
### *General Matters*

(a)    Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing by registered or certified mail, shall be addressed, in the case of the Company, to its principal offices, and in the case of each Member, to his address appearing on the records of the Company, or to such other address as may be designated to the Secretary of the Company, and shall be deemed given when so mailed.

(b)    Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited or invalid under applicable law, such provision shall, if possible, be reformed to the extent necessary to conform with applicable law or shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

(c)    This Agreement may be amended by written approval of the owners of 75% of the Shares outstanding at the time such amendment is proposed. Any such amendment shall be binding upon the Company and the Members. The acceptance of this Agreement by a transferee of Shares shall not be deemed an amendment of this Agreement.

(d)    This Agreement shall terminate on the earlier of the occurrence of any of the following events: (A) The cessation of the Company's business; (B) The bankruptcy (which for this purpose shall mean the filing of a proceeding with respect to the Company under any bankruptcy law, which filing is made by or acquiesced in by the Company or, if not acquiesced in, is not dismissed within 30 days), or insolvency of the Company or the appointment of a receiver or trustee for its assets, if said appointment is not vacated within 30 days after it becomes effective; or (C) The sale, transfer, distribution or other disposition of all or substantially all of the assets, properties and business or stock of the Company (whether by merger or consolidation, sale or distribution of assets or stock or otherwise) to a corporation or entity which is unaffiliated with the Company or with the Members owning as a group a majority of the outstanding Shares. Thereafter, no

FILED DATE: 3/11/2019 7:33 PM   2019L002607

restrictions shall be in effect by virtue of this Agreement with respect to any Shares, and the legend required by Section 4 hereof to be placed on the certificates for the Shares shall be removed.

(e)    All references herein to the owner or holder of Shares of the Company include all individuals and organizations which own, hold or have a legally-enforceable interest in the Shares, regardless of the form of ownership and of the manner and purpose for which such ownership was obtained.

(f)    This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

(g)    This Agreement may be executed in any number of copies and by different parties on separate counterparts.

(h)    The parties declare that it is impossible to measure in money the damages to a party or to the legal representative of a decedent or a disabled person by reason of a failure to perform any of the obligations under this Agreement.  Therefore, if a party or the legal representative of a decedent or a disabled person  shall institute any action or proceeding to enforce the provisions hereof, no person (including the Company) against whom such action or proceeding is brought shall urge in any such action or proceeding the claim or defense that a remedy at law exists.

(i)    This Agreement shall be subject to and governed by the laws of the State of Illinois, irrespective of the fact that one or more of the parties now is or may become a resident or domiciliary of a different state, or may have executed this Agreement in a different state.

Chicago South Loop Hotel, LLC

By: _____          _____
        President                                    James D. White

Attest: _____          _____
        Secretary                                    Louis P. Dodd.

                                                     _____
                                                     Floyd Max, D.D.S.

                                                     _____
                                                     Jerry Cooper

5

FILED DATE: 3/11/2019 7:33 PM   2019L002607

Exhibit "A"

<u>Consent</u>

The undersigned hereby  consents to and agrees to be bound by the terms and
conditions of the Restrictive Stock Agreement dated March 14, 2007, by and between
Chicago South Loop Hotel, LLC and its Members, and acknowledges the receipt from the
Company of a copy of the Agreement.

_____

*6*

# EXHIBIT E

 Gmail

**Todd Hansen <toddhansen10@gmail.com>**

## Fwd: CSLH Membership Interest Purchase Agreement v. July 11
1 message

**Todd Hansen <toddhansen10@gmail.com>**                                    Tue, Dec 2, 2025 at 8:55 AM
To: TODDHANSEN10@gmail.com

Todd Hansen
812-605-0004 (cell)

Begin forwarded message:

> **From:** J Mark Lukanich <jmlukanich@jmllaw.net>
> **Date:** May 4, 2023 at 5:09:56 PM EDT
> **To:** Todd Hansen <toddhansen10@gmail.com>, Jerry Kurzac <jkurzac@gmail.com>
> **Cc:** Vickie White <cvwhite@hotmail.com>
> **Subject: Fwd: CSLH Membership Interest Purchase Agreement v. July 11**

Jerry and Todd:

Below is the email to Barry Weiss, Dodd's attorney, forwarding the Membership Asset Purchase Agreement
that provided for Dodd to purchase 1/2 of the selling minority members' interests in Chicago South Loop Hotel,
LLC. Neither Dodd nor his attorney responded to the email but during a court appearance in
September 2020 I advised Weiss that Vickie was about to sign the agreement. I also advised the judge, in
Weiss' presence, that Vickie and the minority shareholders were about to sign the membership interest
purchase agreement. Weiss did not comment and voiced no objection.

Also attached is a copy of an email Vickie sent directly to Dodd asking him to waive his right to buy the
minority members' interests. To my knowledge Dodd did not respond to that email.

Please let me know when Mr. Goodman will be substituting his appearance in the CSLH foreclosure action
and the Amber Motel, Inc. litigation. Discovery is ongoing in the Amber matter so Mr. Goodman may wish to
get involved as soon as possible.

Let me know if you have any questions or require anything further.

Mark

J. Mark Lukanich
Law Office of J. Mark Lukanich, P.C.
7270 W. College Drive, Suite 101
Palos Heights, IL 60463
Office: 708-361-5556
Mobile: 630-606-5556
Fax:      708-361-2103

---------- Forwarded message ---------
From: **Levin, Scott M.** <slevin@howardandhoward.com>
Date: Sat, Jul 11, 2020 at 1:03 PM
Subject: CSLH Membership Interest Purchase Agreement v. July 11
To: J. Mark Lukanich (jmlukanich@jmllaw.net) <jmlukanich@jmllaw.net>, Barry Weiss (topper-
weiss@sbcglobal.net) <topper-weiss@sbcglobal.net>

Pursuant to our telephone conversation, I the attached Purchase Agreement we had negotiated with White had been modified to also include Dodd. There have been no substantive changes other than to give Dodd the right to purchase 50% of the interests of the minority owners. Please let me know directly if you have any comments. Given the timing of things, the agreement should be executed next week.

Scott

**Scott M. Levin**
Attorney and Counselor

200 S. Michigan Ave., Ste. 1100, Chicago, IL 60604
**D:** 312.456.3418 | **F:** 312.939.5617
slevin@howardandhoward.com | Bio | vCard | LinkedIn

**NOTICE:** Information contained in this transmission to the named addressee is proprietary information and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.

**COMMUNICATION:** Please copy all Intellectual Property instructions to ipdocket@h2law.com to ensure proper handling and send corresponding originals to our Royal Oak, MI office.

<Withdraw Intend to purchase Vivians Astrid 712 Shares.pdf>

**2 attachments**

Howard & Howard
law for business·

hh_logo_0f1dbcb0-80ba-4943-b445-368a57555dd0.png
6K

CSLH Membership Interest Purchase Agreement 4829-1900-5378 v.1.docx
41K

# EXHIBIT F

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

## CSLH MEMBERSHIP INTEREST PURCHASE AGREEMENT

This CSLH Membership Interest Purchase Agreement (this "**Agreement**") is dated December 30, 2020, by and among Vivian Murphy ("**Vivian**"), Astrid Cooper ("**Astrid**" and each of Astrid and Vivian, a "**Seller**" and collectively, the "**Sellers**"), and Vickie White (the "**Purchaser**").

WHEREAS, Vivian owns 10.0% of the membership interests (the "**Vivian Interest**") of the Chicago South Loop Hotel, LLC, an Illinois limited liability company (the "**Company**") and Astrid owns 5.0% of the membership interests (the "**Astrid Interest**" and, together with the Vivian Interest, the "**Applicable Interests**") of the Company; and

WHEREAS, Sellers desire to sell, and Purchaser desires to purchase, the Applicable Interests, in accordance with the terms and conditions of this Agreement.

WHEREAS, Purchaser has previously deposited $302,430, representing 10% of the Purchase Price, into escrow in the Howard & Howard Client Trust Fund (the "**Escrow Fund**").

NOW THEREFORE, in consideration of the mutual promises, covenants and conditions hereinafter set forth, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree:

1.     Purchase and Sale.

    1.1    Agreement to Purchase and Sell.  Subject to the terms and conditions set forth herein, at the Closing (as defined herein), each Seller will sell to the Purchaser, and the Purchaser will purchase from each Seller, all of such Seller's right, title and interest in and to the Applicable Interests, free and clear of all liens, encumbrances, security interests and other adverse claims, whether arising by agreement, operation of law or otherwise ("**Claims**"), except for rights retained pursuant to the Pledge and Security Agreement.

    1.2    Purchase Price.  The aggregate purchase price for the Applicable Interests is Three Million Twenty-four Thousand Three Hundred Dollars ($3,024,300) (the "**Purchase Price**"), which shall be payable to Sellers as follows:

a.  $2,016,200 to Vivian and $1,008,100 to Astrid, with all payments by electronic transfer of funds to an account designated by each Seller.

b.  10% of the Purchase Price, being Three Hundred Two Thousand Four Hundred Thirty Dollars ($302,430), at the Closing, with $201,620 being paid to Vivian and $100,810 being paid to Astrid, which shall be paid in cash from the Escrow Fund.

c.  10% of the Purchase Price, being Three Hundred Two Thousand Four Hundred Thirty Dollars ($302,430) to be paid in cash at on December 30, 2021, with $201,620 being paid to Vivian and $100,810 being paid to Astrid, with interest at five (5%) percent from the date of this Agreement until the date of payment.

1

**EXHIBIT A**

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

d. 5% of the Purchase Price, One Hundred Fifty One Thousand Two Hundred Fifteen Dollars ($151,215) to be paid in cash at on December 30, 2022, with $100,810 being paid to Vivian and $50,405 being paid to Astrid, with interest at five (5%) percent from the date of this Agreement until the date of payment.

e. 75% of the Purchase Price, being Two Million Two Hundred Sixty Eight Thousand Two Hundred Twenty Dollars ($2,268,225), with $1,512,150 paid to Vivian and $756,075 paid to Astrid, to be paid by promissory notes, with interest at five (5%) percent, amortized over 30 years, payable in 24 monthly payments followed by a balloon payment, with the terms and in the form attached as **Exhibit A** to this Agreement, secured by the Applicable Interests with the terms and in the form the Pledge and Security Agreement attached as **Exhibit B** to this Agreement.

### 1.3    Closing.

a. The closing of the sale of the Applicable Interests to the Purchaser (the "Closing") shall take place remotely via the electronic exchange of documents and signatures on December 30, 2020 at such time and place as the parties hereto mutually agreed upon, orally or in writing. The parties hereto acknowledge and agree that all proceedings at the Closing and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously.

b. Vivian shall deliver to Purchaser at the Closing, executed copies of the following documents:

    i.    this Agreement;

    ii.    an assignment of the Vivian Interest;

    iii.    a written resignation whereby Vivian shall resign from all positions as an officer, manager, and employee (as applicable) of the Company.

c. Astrid shall deliver to Purchaser at the Closing, executed copies of the following documents:

    i.    this Agreement;

    ii.    an assignment of the Astrid Interest;

    iii.    a written resignation whereby Astrid shall resign from all positions as an officer, manager, and employee (as applicable) of the Company

    2.    Representations and Warranties of Sellers. Each Seller represents and warrants to the Purchaser with respect to her Applicable Interests as follows:

2

4842-7053-2820 (Version 1)

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

    **2.1** <u>Power; Authorization.</u>  Seller has all requisite power and authority to enter into this Agreement, to sell all of her right, title and interest in and to the Applicable Interests hereunder and to carry out and perform her obligations under the terms of this Agreement. This Agreement is a valid and binding obligation of Seller, enforceable against her in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

    **2.2** <u>Compliance with other Instruments and Laws.</u>  Neither the execution and delivery of this Agreement by Seller nor the consummation by Seller of the transactions contemplated  herein will conflict with or constitute a breach of, any of the terms, conditions or provisions of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any Governmental Authority or of any arbitration award to which Seller is subject or by which Seller is bound.

    **2.3** <u>Title to Applicable Interests; Claims; etc.</u>  Sellers have record and beneficial ownership of their Applicable Interests, free and clear of any and Claims. Upon delivery by Sellers of the Applicable Interests to the Purchaser as contemplated herein, the Purchaser shall acquire legal and beneficial ownership of, and shall have good title to, the Applicable Interests, free and clear of all Claims. The Applicable Interests constitute 100% of Sellers' ownership interests in the Company.

    **2.4** <u>Seller Investigation.</u>  Seller is fully familiar with the business, operations, financial condition and prospects of the Company and has made an independent evaluation that the Purchase Price is fair and equitable. Each Seller has had the opportunity to discuss this Agreement and the transactions set forth herein with such Seller's advisors as such Seller has deemed appropriate, including but not limited to counsel of such Seller's own choosing, and has had the opportunity to ask questions of the officers and managers of the Company, which questions have been answered to such Seller's satisfaction.

    **2.5** <u>No Conflicts.</u>  Except for any approval and/or consent of the members of the Company required under the Company's Operating Agreement, dated January 1, 2007 (as amended) and the Restrictive Stock Agreement Chicago South Loop Hotel dated March 14, 2007 ("Member Consent"), to the best of Seller's knowledge, the execution, delivery and performance by Seller of this Agreement and such other documents executed in connection herewith, and the consummation of the transactions contemplated hereby and thereby, do not and will not:

      (a) require the consent, notice or other action by any Person under;
      (b) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under;
      (c) result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel;

4842-7053-2820 (Version 1)

FILED DATE: 6/13/2023 2:06 PM 2019CH10966

any contract or agreement to which Seller is a party or by which Seller is bound or to which any of her respective properties and assets are subject. To the best of Seller's knowledge, no consent, approval, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement and such other documents executed in connection herewith and the consummation of the transactions contemplated hereby and thereby. For purposes of this Agreement, (i) "**Person**" shall mean an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity, and (ii) "**Governmental Authority**" shall mean any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority, or any arbitrator, court or tribunal of competent jurisdiction.

      2.6    <u>Legal Proceedings.</u> Except for the cases of *White v. Murphy*, No. 19 CH 10966, and *Murphy v. Chicago South Loop Hotel, LLC*, No. 19 CH 11737, both filed in the Circuit Court of Cook County and *Impact Networking, Inc. v. Chicago South Loop Hotel, LLC*, No. 20 L 6784 (the "Company Litigation Matters"), there are no Actions pending or threatened (a) against or by either Seller or any affiliate thereof relating to the Company; or (b) against or by either Seller or any affiliate thereof that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred, or circumstance exists that may give rise to, or serve as a basis for, any such Action. For purposes of the foregoing, "**Action**" shall mean any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

      2.7    <u>Limited Warranties.</u> Sellers make no other warranties, express or implied, including with respect to the Company, the Chicago South Loop Hotel or their interests in the Company.

      3.    <u>Representations and Warranties of Purchaser.</u> Purchaser hereby represents and warrants to Sellers, on behalf of herself only, as follows:

      3.1    <u>Power; Authorization.</u> The Purchaser has all requisite power and authority to enter into this Agreement and to carry out and perform her obligations under the terms of this Agreement. This Agreement is being duly executed and delivered by the Purchaser. All actions on the part of Purchaser necessary for the execution, performance and delivery by Purchaser of this Agreement have been taken and/or will have been taken prior to the Closing on this transaction, unless otherwise agreed to in writing by the parties. This Agreement is a valid and binding obligation of Purchaser, enforceable against her in accordance with its respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      3.2    <u>Purchaser Investigation.</u> Purchaser is fully familiar with the business, operations, financial condition and prospects of the Company and has made an independent

4

4842-7053-2820 (Version 1)

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

evaluation that the Purchase Price is fair and equitable. Purchaser has had the opportunity to discuss this Agreement and the transactions set forth herein with such Purchaser's advisors as Purchaser has deemed appropriate, including but not limited to counsel of such Purchaser's own choosing, and has had the opportunity to ask questions of the Sellers, which questions have been answered to Purchaser's satisfaction. Purchaser acknowledges that except for their express representations in this Agreement, Sellers make no other warranties, express or implied, including with respect to the Company, the Chicago South Loop Hotel or their interests in the Company

      3.3   <u>Compliance with Other Instruments and Laws</u>. Neither the execution and delivery of this Agreement by the Purchaser nor the consummation by the Purchaser of the transactions contemplated herein will conflict with or constitute a breach of, any of the terms, conditions or provisions of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any Governmental Authority or of any arbitration award to which the Purchaser is subject or by which the Purchaser is bound.

      3.4   <u>No Conflicts.</u> Except for the Member Consent and the Mortgage, Security Agreement and Financing Statement between Chicago South Loop Hotel Owner, LLC and Morgan Stanley Mortgage Capital Holdings LLC, dated October 24, 2013, the execution, delivery and performance by the Purchaser of this Agreement and such other documents executed in connection herewith, and the consummation of the transactions contemplated hereby and thereby, do not and will not:

      (a) require the consent, notice or other action by any Person under;

      (b) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under;

      (c) result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel;

any contract or agreement to which the Purchaser is a party or by which the Purchaser is bound or to which any of her respective properties and assets are subject. No consent, approval, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to the Purchaser in connection with the execution and delivery of this Agreement and such other documents executed in connection herewith and the consummation of the transactions contemplated hereby and thereby.

      3.5   `<u>Legal Proceedings.</u> Except for the Company Litigation Matters, there are no Actions pending or threatened (a) against or by Purchaser or any affiliate thereof relating to the Company; or (b) against or by Purchaser or any affiliate thereof that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred, or circumstance exists that may give rise to, or serve as a basis for, any such Action.

      4.   <u>Release of Claims</u>. Each party hereto, on behalf of herself and her respective agents, heirs, executors, administrators, successors, representatives and assigns (each a "Releasing Party"), hereby fully, unconditionally and irrevocably releases and discharges each other party hereto, the Company and each of their respective affiliates' officers, directors, managers,

5

shareholders, members, partners, agents, attorneys, employees, executors, administrators, heirs, representatives, successors and assigns ("Released Parties") from all claims, demands, agreements, contracts, covenants, torts, liens, actions, causes of action, contracts, debts, sums of money, commissions, damages, obligations, liabilities and rights whatsoever at law or in equity, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, suspected or unsuspected, now existing (including those matters arising out of or in connection with the Company Litigation Matter) or which may hereafter accrue, based upon any act or omission by any of the Released Parties occurring prior to the date of this Agreement related to claims arising out of or in connection with the Applicable Interests, each Seller's sale and the Purchaser's purchase of the Applicable Interests, any causes of action of any nature whatsoever, cognizable at law or in equity, which a Releasing Party now has or claims, or might hereafter have or claim, against such Released Party based upon such Seller's ownership of the Applicable Interests or the Purchaser's purchase of the Applicable Interests (as applicable), or any real, implied or alleged participation such Seller may have possessed, or believed to have possessed, in the right to purchase additional membership interests in the Company, and any profits, losses, cash distributions or capital appreciation arising out of property or assets of any kind of the Company, except that the foregoing release shall not apply to a Releasing Party's or her successors' and assigns' right to enforce the provisions of this Agreement.

5.     <u>Dismissal of Company Litigation Matters</u>. The Company Litigation Matters shall be dismissed, with prejudice, within 7 days after the Closing.

6.     <u>Miscellaneous</u>.

6.1     <u>Further Assurances</u>. From and after the Closing, the parties shall execute, file and deliver such further documents, and perform such further acts, as may be necessary to effectuate the terms contained in this Agreement, and to otherwise comply with and satisfy the terms, provisions, conditions and intentions of this Agreement.

6.2     <u>Waivers and Amendments</u>. Neither this Agreement nor any provision hereof may be modified, amended, waived, discharged or terminated except pursuant to an instrument in writing executed and delivered by all of the parties hereto.

6.3     <u>Governing Law</u>. This Agreement shall be governed in all respects by the laws of the State of Illinois as such laws are applied to agreements between Illinois residents entered into and to be performed entirely within Illinois.

6.4     <u>Successors and Assigns</u>. The provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto. Nothing in this Agreement, express or implied, is intended to confer on any Person other than the parties hereto, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

6.5     <u>Entire Agreement</u>. This Agreement, the exhibits and schedules to this Agreement and the other documents delivered pursuant hereto constitute the full and entire

4842-7053-2820 (Version 1)

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

understanding and agreement between the parties with regard to the subject matter hereof and thereof.

6.6     Notice.  All notices and other communications required or permitted hereunder shall be in writing and shall be sent via facsimile, e-mail, overnight courier service or mailed by certified or registered mail, postage prepaid, return receipt requested, addressed or sent to the home addresses of the parties, or at such other address as the applicable party shall have furnished to the other parties in writing pursuant to this Section 6.6, with a copy emailed to the parties' attorneys.

6.7     Severability.  In case any provision of this Agreement shall be declared invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, but this Agreement shall be reformed and construed to the maximum extent possible consistent herewith as if such invalid or illegal or unenforceable provision, or part of a provision, had never been contained herein, and so that such provisions or part reformed shall be valid, legal and enforceable.

6.8     Construction.  The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. This Agreement shall not be construed against any party for having drafted it.

6.9     Counterparts; Electronic Signature.  This Agreement may be executed in counterparts and by the exchange of electronically transmitted counterparts, all of which together shall constitute the original of one instrument. Counterparts may be delivered by facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.10     Consent to Jurisdiction.  The parties hereto irrevocably submit themselves to the exclusive jurisdiction of the courts of the State of Illinois and to the jurisdiction of the County of Cook for the purpose of bringing any action that may be brought in connection with this Agreement. The parties agree that they shall not assert any claim that they are not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. To the maximum extent permitted by law, the notice provisions of this Agreement shall apply to service of process with respect to any action brought under this Agreement.

6.11     Waiver of Jury Trial. EACH     PARTY     IRREVOCABLY     AND UNCONDITIONALLY  WAIVES,  TO  THE  FULLEST  EXTENT  PERMITTED  BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES  ATTACHED  TO  THIS  AGREEMENT,  OR  THE  TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY

7

4842-7053-2820 (Version 1)

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above.

**SELLERS:**                                 **PURCHASER:**

_____          _____
Vivian Murphy                            Vickie White

_____
Astrid Cooper

8

4842-7053-2820 (Version 1)

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

IN WITNESS WHEREOF. the parties have executed this Agreement as of the date first above.

**SELLERS:**                                           **PURCHASER:**

Vivian Murphy                                          Vickie White

Astrid Cooper

FILED DATE: 6/13/2023 2:06 PM 2019CH10966

## PROMISSORY NOTE

**$ 1,512,150**                                                 **Dated: December ___, 2020**

In consideration of the mutual promises, agreements and covenants contained herein, the undersigned, Vickie White ("Obligor"), agrees and promises to pay Vivian Murphy ("Obligee") One Million Five Hundred Twelve Thousand One Hundred Fifty Dollars ($1,512,150) ("Principal Amount"), with interest as stated in this Promissory Note.

1.  **Promissory Note Secured by Stock**. All sums due under this Promissory Note are secured by 100% of Vivian's Interests, being 10% of the membership interests in Chicago South Loop Hotel, LLC, as defined in the CSLH Membership Interest Purchase Agreement entered into by the parties on December ___, 2020. Obligor grants to Obligee a first priority security interest in Vivian's Interests and pledges Vivian's Interests to Obligee pursuant to the Security Agreement of even date hereof.

2.  **Payment of Principal and Interest**. This Promissory Note shall bear interest at the rate of five (5%) percent per annum and amortized over two (2) years until the Principal Amount has been paid in full, as reflected on **Exhibit 1** to this Promissory Note. Obligor shall pay to Obligee the Principal Amount with: (a) 24 equal monthly installments of **$8,115.55**, with the first monthly installment due on March 1, 2021, and thereafter on the first of each month, and (b) the final payment of **$1,466,389.12** due February 1, 2023, in accordance with the amortization schedule attached as **Exhibit 1**.

A late charge equal to 5% of the amount of any principal and interest installment so due, or equal to $25, whichever is greater, shall be added to such installment payment if not made within seven calendar days after the due date.

3.  **Payments**. All payments due hereunder are to be made to Obligee via electronic transfer or such place designated in writing by Obligee, in the most legal tender of the United States of America current on the date such sums or payments are respectively due.

4.  **Default and Acceleration of Indebtedness**. If any payment due on this Promissory Note is not received by Obligee within five (5) days after the due date, Obligee shall provide written notice to Obligor and a copy of such notice via electronic mail. Obligor shall have five (5) days after such notice to cure the default by making such payment in accordance with this Note (the "Cure Period"). If the payment remains unpaid after the Cure Period, the entire unpaid Principal Amount, together with interest accrued thereon, shall become immediately due and payable at the place of payment aforesaid.

Obligor hereby agrees that in the event any payment due hereunder is not paid within five (5) days of the Due Date or during the subsequent Cure Period, that the rate of interest on this Note, at the election of Obligee without notice or demand, which is hereby expressly waived, shall be increased to be equal to 9% per year ("Default Rate"). Obligor shall be obligated to pay interest on the unpaid principal balance of this Note at the Default Rate, to be computed from the Note's origination date through and including the date of actual receipt of the overdue payment, whether

1

**EXHIBIT A-1 TO PURCHASE AGREEMENT**

4827-3220-6548 v.1

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

that overdue payment is a monthly installment payment or the entire indebtedness. Nothing herein shall be construed as an agreement or privilege to accelerate or extend the date of the payment of any installment of the indebtedness, or of the entire indebtedness, nor as a waiver of any other right or remedy accruing to Obligee by reason of any such default.

5.    **Remedies**.  The remedies of Obligee, or other holder hereof, as provided herein and in the Security Agreement shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of Obligee, or other holder hereof, and may be exercised as often as occasion therefore shall arise.  Failure of Obligee, or other holder hereof, for any period of time or on more than one occasion, to exercise its option to accelerate the indebtedness, as provided in Section 4 hereof, shall not constitute a waiver of the right to exercise the same at any time thereafter.  No act of omission or commission of Obligee, or other holder hereof, including specifically any failure to exercise any right, remedy or recourse, shall be deemed a waiver or release of the same and any such waiver or release is to be effected only through a written document executed by Obligee, or other holder hereof, and then only to the extent specifically recited therein.

6.    **No Waiver**.  A waiver or release with reference to any one Event of Default shall not be construed as a waiver or release of any subsequent Event of Default or as a bar to any subsequent exercise of Obligee's or other holder's rights or remedies hereunder.  Except as otherwise specifically required herein, notice of the exercise of any right or remedy granted to Obligee, or other holder hereof, by this Promissory Note is not required to be given.

7.    **Prepayment**.  Obligor shall have the right to prepay, without penalty, the unpaid Principal Amount, in whole or in part, at any time.

8.    **Costs of Collection**.  In the event that this Promissory Note is placed in the hands of an attorney-at-law for collection upon the occurrence of an Event of Default or to enforce any of the rights or requirements contained herein; or in the event that proceedings at law, in equity, bankruptcy, receivership or other legal proceedings are instituted in connection herewith; or if Obligee, or other holder hereof, is made a party to any such proceeding, Obligor hereby agrees to pay all reasonable costs of collecting or attempting to collect this Promissory Note, as well as to pay all reasonable costs of collecting or attempting to collect from Obligor any outstanding amounts due hereunder and any costs of protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to the Principal Amount, interest and other amounts payable hereunder.

9.    **Waiver of Presentment, Protest and Notice of Dishonor**.  Obligor and all other makers, endorsers, guarantors and sureties hereof, if any, jointly and severally waive presentment, protest and notice of dishonor.

10.    **Business Purposes**.  This Promissory Note is made for business purposes.

2

**EXHIBIT A-1 TO PURCHASE AGREEMENT**

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

11.     **Time**.  Time is of the essence of this Promissory Note and each of the provisions hereof.

12.     **Governing Law**.  This Promissory Note has been negotiated in, has been executed and delivered in, is payable in and shall be governed by the laws of the State of Illinois.

13.     **Headings**.  All headings are for convenience purposes only and shall not be construed to define or otherwise limit the provisions of this Promissory Note.

14.     **Interpretation**.  The language in all parts of this Promissory Note shall be in all cases construed simply according to its fair meaning and not strictly for or against any party.  All words used herein in the singular number shall extend to and include the plural number.  All words used herein in the plural number shall extend to and include the singular number.  All words used in any gender, male, female or neuter shall extend to and include all genders as may be applicable in any particular context.  This Promissory Note has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein.  Accordingly, any rule of law or any other statutes, legal decisions or common law principles of similar effect that would require interpretation of any ambiguities against the party that has drafted it or them are of no application and are hereby expressly waived by all parties hereto.

15.     **Binding Agreement; Assignment**.  This Promissory Note shall be binding upon and inure to the benefit of the parties named herein and to their respective successors and assigns.  This Promissory Note may be assigned by Obligee without the consent of Obligor.  This Promissory Note and the rights, interests and obligations of Obligor may not be assigned without the written consent of Obligee.

**IN WITNESS WHEREOF**, Obligor has executed and delivered this Promissory Note on the day and year first above written.

**OBLIGOR**

---

Vickie White

3

**EXHIBIT A-1 TO PURCHASE AGREEMENT**

4827-3220-6548 v.1

## Amortization Schedule

## EXHIBIT 1 to Murphy Promissory Note

# Business Loan Calculator

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

| Loan Amount | 1512150 |
| Interest Rate | 5 |
| Compound | Monthly (APR) ▼ |
| Loan Term | 30 years |
| | 0 months |
| Pay Back | Every Month ▼ |
| Origination Fee | 0 |
| Other Fees | 0 |

**$8,117.55 Per Month**

| Total of 360 Loan Payments | $2,922,317.34 |
| Interest | $1,410,167.34 |

# Amortization Schedule

| | Beginning Balance | Interest | Principal | Ending Balance |
|---|---|---|---|---|
| 1 | $1,512,150.00 | $6,300.63 | -$1,816.92 | $1,510,333.08 |
| 2 | $1,510,333.08 | $6,293.05 | -$1,824.49 | $1,508,508.58 |
| 3 | $1,508,508.58 | $6,285.45 | -$1,832.10 | $1,506,676.49 |
| 4 | $1,506,676.49 | $6,277.82 | -$1,839.73 | $1,504,836.76 |
| 5 | $1,504,836.76 | $6,270.15 | -$1,847.40 | $1,502,989.36 |

4

**EXHIBIT A-1 TO PURCHASE AGREEMENT**

4827-3220-6548 v.1

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

| 6 | $1,502,989.36 | $6,262.46 | -$1,855.09 | $1,501,134.27 |
| 7 | $1,501,134.27 | $6,254.73 | -$1,862.82 | $1,499,271.45 |
| 8 | $1,499,271.45 | $6,246.96 | -$1,870.58 | $1,497,400.86 |
| 9 | $1,497,400.86 | $6,239.17 | -$1,878.38 | $1,495,522.49 |
| 10 | $1,495,522.49 | $6,231.34 | -$1,886.20 | $1,493,636.28 |
| 11 | $1,493,636.28 | $6,223.48 | -$1,894.06 | $1,491,742.22 |
| 12 | $1,491,742.22 | $6,215.59 | -$1,901.96 | $1,489,840.26 |
| | | Year #1 End | | |
| 13 | $1,489,840.26 | $6,207.67 | -$1,909.88 | $1,487,930.38 |
| 14 | $1,487,930.38 | $6,199.71 | -$1,917.84 | $1,486,012.54 |
| 15 | $1,486,012.54 | $6,191.72 | -$1,925.83 | $1,484,086.72 |
| 16 | $1,484,086.72 | $6,183.69 | -$1,933.85 | $1,482,152.86 |
| 17 | $1,482,152.86 | $6,175.64 | -$1,941.91 | $1,480,210.95 |
| 18 | $1,480,210.95 | $6,167.55 | -$1,950.00 | $1,478,260.95 |
| 19 | $1,478,260.95 | $6,159.42 | -$1,958.13 | $1,476,302.82 |
| 20 | $1,476,302.82 | $6,151.26 | -$1,966.29 | $1,474,336.53 |
| 21 | $1,474,336.53 | $6,143.07 | -$1,974.48 | $1,472,362.05 |
| 22 | $1,472,362.05 | $6,134.84 | -$1,982.71 | $1,470,379.35 |
| 23 | $1,470,379.35 | $6,126.58 | -$1,990.97 | $1,468,388.38 |
| 24 | $1,468,388.38 | $6,118.28 | -$1,999.26 | $1,466,389.12 |

4827-3220-6548, v. 1

EXHIBIT A-1 TO PURCHASE AGREEMENT

4827-3220-6548 v.1

# PROMISSORY NOTE

**$756,075**                                                          **Dated: December ___, 2020**

In consideration of the mutual promises, agreements and covenants contained herein, the undersigned, Vickie White ("Obligor"), agrees and promises to pay Astrid Cooper ("Obligee") Seven Hundred Fifty Six Thousand Seventy-Five Dollars ($756,075) ("Principal Amount"), with interest as stated in this Promissory Note.

1.    **Promissory Note Secured by Stock.** All sums due under this Promissory Note are secured by 100% of Astrid's Interests, being 5% of the membership interests in Chicago South Loop Hotel, LLC, as defined in the CSLH Membership Interest Purchase Agreement entered into by the parties on December ___, 2020. Obligor grants to Obligee a first priority security interest in Astrid's Interests and pledges Astrid's Interests to Obligee pursuant to the Security Agreement of even date hereof.

2.    **Payment of Principal and Interest.** This Promissory Note shall bear interest at the rate of five (5%) percent per annum and amortized over two (2) years until the Principal Amount has been paid in full, as reflected on **Exhibit 1** to this Promissory Note. Obligor shall pay to Obligee the Principal Amount with: (a) 24 equal monthly installments of **$4,058.77**, with the first monthly installment due on March 1, 2021, and thereafter on the first of each month, and (b) the final payment of **$733,194.56** due February 1, 2023, in accordance with the amortization schedule attached as **Exhibit 1.**

A late charge equal to 5% of the amount of any principal and interest installment so due, or equal to $25, whichever is greater, shall be added to such installment payment if not made within seven calendar days after the due date.

3.    **Payments.** All payments due hereunder are to be made to Obligee via electronic transfer or such place designated in writing by Obligee, in the most legal tender of the United States of America current on the date such sums or payments are respectively due.

4.    **Default and Acceleration of Indebtedness.** If any payment due on this Promissory Note is not received by Obligee within five (5) days after the due date, Obligee shall provide written notice to Obligor and a copy of such notice via electronic mail. Obligor shall have five (5) days after such notice to cure the default by making such payment in accordance with this Note (the "Cure Period"). If the payment remains unpaid after the Cure Period, the entire unpaid Principal Amount, together with interest accrued thereon, shall become immediately due and payable at the place of payment aforesaid.

Obligor hereby agrees that in the event any payment due hereunder is not paid within five (5) days of the Due Date or during the subsequent Cure Period, that the rate of interest on this Note, at the election of Obligee without notice or demand, which is hereby expressly waived, shall be increased to be equal to 9% per year ("Default Rate"). Obligor shall be obligated to pay interest on the unpaid principal balance of this Note at the Default Rate, to be computed from the Note's origination date through and including the date of actual receipt of the overdue payment, whether

**EXHIBIT A-2 TO PURCHASE AGREEMENT**

1

4811-4263-0868 v.1

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

that overdue payment is a monthly installment payment or the entire indebtedness. Nothing herein shall be construed as an agreement or privilege to accelerate or extend the date of the payment of any installment of the indebtedness, or of the entire indebtedness, nor as a waiver of any other right or remedy accruing to Obligee by reason of any such default.

5.    **Remedies.**  The remedies of Obligee, or other holder hereof, as provided herein and in the Security Agreement shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of Obligee, or other holder hereof, and may be exercised as often as occasion therefore shall arise.  Failure of Obligee, or other holder hereof, for any period of time or on more than one occasion, to exercise its option to accelerate the indebtedness, as provided in Section 4 hereof, shall not constitute a waiver of the right to exercise the same at any time thereafter.  No act of omission or commission of Obligee, or other holder hereof, including specifically any failure to exercise any right, remedy or recourse, shall be deemed a waiver or release of the same and any such waiver or release is to be effected only through a written document executed by Obligee, or other holder hereof, and then only to the extent specifically recited therein.

6.    **No Waiver.**  A waiver or release with reference to any one Event of Default shall not be construed as a waiver or release of any subsequent Event of Default or as a bar to any subsequent exercise of Obligee's or other holder's rights or remedies hereunder.  Except as otherwise specifically required herein, notice of the exercise of any right or remedy granted to Obligee, or other holder hereof, by this Promissory Note is not required to be given.

7.    **Prepayment.**  Obligor shall have the right to prepay, without penalty, the unpaid Principal Amount, in whole or in part, at any time.

8.    **Costs of Collection.**  In the event that this Promissory Note is placed in the hands of an attorney-at-law for collection upon the occurrence of an Event of Default or to enforce any of the rights or requirements contained herein; or in the event that proceedings at law, in equity, bankruptcy, receivership or other legal proceedings are instituted in connection herewith; or if Obligee, or other holder hereof, is made a party to any such proceeding, Obligor hereby agrees to pay all reasonable costs of collecting or attempting to collect this Promissory Note, as well as to pay all reasonable costs of collecting or attempting to collect from Obligor any outstanding amounts due hereunder and any costs of protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to the Principal Amount, interest and other amounts payable hereunder.

9.    **Waiver of Presentment, Protest and Notice of Dishonor.**  Obligor and all other makers, endorsers, guarantors and sureties hereof, if any, jointly and severally waive presentment, protest and notice of dishonor.

10.    **Business Purposes.**  This Promissory Note is made for business purposes.

11.    **Time.**  Time is of the essence of this Promissory Note and each of the provisions hereof.

**EXHIBIT A-2 TO PURCHASE AGREEMENT**

2

4811-4263-0868 v.1

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

12.    <u>**Governing Law**</u>.  This Promissory Note has been negotiated in, has been executed and delivered in, is payable in and shall be governed by the laws of the State of Illinois.

13.    <u>**Headings**</u>.  All headings are for convenience purposes only and shall not be construed to define or otherwise limit the provisions of this Promissory Note.

14.    <u>**Interpretation**</u>.  The language in all parts of this Promissory Note shall be in all cases construed simply according to its fair meaning and not strictly for or against any party.  All words used herein in the singular number shall extend to and include the plural number.  All words used herein in the plural number shall extend to and include the singular number.  All words used in any gender, male, female or neuter shall extend to and include all genders as may be applicable in any particular context.  This Promissory Note has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein.  Accordingly, any rule of law or any other statutes, legal decisions or common law principles of similar effect that would require interpretation of any ambiguities against the party that has drafted it or them are of no application and are hereby expressly waived by all parties hereto.

15.    <u>**Binding Agreement; Assignment**</u>.  This Promissory Note shall be binding upon and inure to the benefit of the parties named herein and to their respective successors and assigns.  This Promissory Note may be assigned by Obligee without the consent of Obligor.  This Promissory Note and the rights, interests and obligations of Obligor may not be assigned without the written consent of Obligee.

**IN WITNESS WHEREOF**, Obligor has executed and delivered this Promissory Note on the day and year first above written.

**OBLIGOR**

_____

Vickie White

**EXHIBIT A-2 TO PURCHASE AGREEMENT**

3

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

# Amortization Schedule

## EXHIBIT 1 to Cooper Promissory Note

# Business Loan Calculator

| Loan Amount | 756075 |
|---|---|
| Interest Rate | 5 |
| Compound | Monthly (APR) |
| Loan Term | 30 years |
| | 0 months |
| Pay Back | Every Month |
| Origination Fee | 0 |
| Documentation Fee | |
| Other Fees | 0 |

**$4,058.77 Per Month**

| | |
|---|---|
| Total of 360 Loan Payments | $1,461,158.67 |
| Interest | $705,083.67 |

## Amortization Schedule

| | Beginning Balance | Interest | Principal | Ending Balance |
|---|---|---|---|---|
| 1 | $756,075.00 | $3,150.31 | -$908.46 | $755,166.54 |
| 2 | $755,166.54 | $3,146.53 | -$912.25 | $754,254.29 |
| 3 | $754,254.29 | $3,142.73 | -$916.05 | $753,338.24 |
| 4 | $753,338.24 | $3,138.91 | -$919.86 | $752,418.38 |
| 5 | $752,418.38 | $3,135.08 | -$923.70 | $751,494.68 |
| 6 | $751,494.68 | $3,131.23 | -$927.55 | $750,567.14 |

**EXHIBIT A-2 TO PURCHASE AGREEMENT**

4

4811-4263-0868 v.1

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

| 7 | $750,567.14 | $3,127.36 | -$931.41 | $749,635.72 |
| 8 | $749,635.72 | $3,123.48 | -$935.29 | $748,700.43 |
| 9 | $748,700.43 | $3,119.59 | -$939.19 | $747,761.24 |
| 10 | $747,761.24 | $3,115.67 | -$943.10 | $746,818.14 |
| 11 | $746,818.14 | $3,111.74 | -$947.03 | $745,871.11 |
| 12 | $745,871.11 | $3,107.80 | -$950.98 | $744,920.13 |
| | | Year #1 End | | |
| 13 | $744,920.13 | $3,103.83 | -$954.94 | $743,965.19 |
| 14 | $743,965.19 | $3,099.85 | -$958.92 | $743,006.27 |
| 15 | $743,006.27 | $3,095.86 | -$962.91 | $742,043.36 |
| 16 | $742,043.36 | $3,091.85 | -$966.93 | $741,076.43 |
| 17 | $741,076.43 | $3,087.82 | -$970.96 | $740,105.48 |
| 18 | $740,105.48 | $3,083.77 | -$975.00 | $739,130.47 |
| 19 | $739,130.47 | $3,079.71 | -$979.06 | $738,151.41 |
| 20 | $738,151.41 | $3,075.63 | -$983.14 | $737,168.27 |
| 21 | $737,168.27 | $3,071.53 | -$987.24 | $736,181.03 |
| 22 | $736,181.03 | $3,067.42 | -$991.35 | $735,189.67 |
| 23 | $735,189.67 | $3,063.29 | -$995.48 | $734,194.19 |
| 24 | $734,194.19 | $3,059.14 | -$999.63 | $733,194.56 |

**EXHIBIT A-2 TO PURCHASE AGREEMENT**

5

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

## CSLH PLEDGE AND SECURITY AGREEMENT

This CSLH Pledge and Security Agreement is given by Vickie White ("Debtor") in favor of Vivian Murphy ("Secured Party").

### WITNESSETH:

WHEREAS, Debtor and Secured Party are parties to the CSLH Membership Interest Purchase Agreement entered into by the parties on December ____, 2020 (the "Agreement"), pursuant to which Secured Party sold 10% of the membership interests in Chicago South Loop Hotel, LLC,, being all of her membership interests, to Debtor (the "Vivian's Interests");

WHEREAS, 75% of the purchase price for Vivian's Interests is payable by the delivery to Secured Party of the Promissory Note of even date herewith, in the principal amount of One Million Five Hundred Twelve Thousand One Hundred Fifty Dollars ($1,512,150) (the "Note"); and

WHEREAS, the Note provides that Debtor shall grant to Secured Party a first priority security interest in 100% of Vivian's Interests to secure performance and payment of all of Debtor's obligations under the Note.

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Grant of Security Interest – Collateral.**  To secure the Obligations (as defined in Paragraph 2), Debtor hereby grants to Secured Party a first priority security interest in 100% of Vivian's Interests (the "Collateral").

2.    **Obligations.**  The obligations secured by this Agreement ("Obligations") are the following:

a.    The indebtedness of Debtor to Secured Party evidenced by the Note; and

b.    Court costs, and attorneys' fees and expenses, of Secured Party incurred in connection herewith or with the Note; and

c.    Any other sum due under the Note.

d.    Debtor's obligation to pay the Purchase Price as required by the Agreement, and attorneys' fees and expenses, of Secured Party incurred in connection with enforcing Debtor's obligation to pay the Purchase Price.

1
**EXHIBIT B-1 TO PURCHASE AGREEMENT**

4819-3247-0740 v.2

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

3.    **Representation , Warranties, and Promises**.  Debtor represents, warrants, and promises as follows:

a.    Debtor is the owner of the Collateral free and clear of any claim of any kind other than the security interest herein granted.  No security agreement, financing statement or lien instrument covering all or any part of Collateral is on file or on record in any public office.  Debtor will at any time defend Collateral against any and all claims of any person adverse to the claim of Secured Party.  Debtor has full power and authority to enter into this Security Agreement.

b.    Debtor authorizes Secured Party to advance for Debtor's account, after giving reasonable notice to Debtor, any sum reasonably necessary to preserve Collateral.

c.    All of the representations and warranties in the Note and in any other notes or instruments pertaining to Collateral are true and correct.

d.    Debtor shall comply with all of her agreements and promises in the Note and in any other notes or instruments pertaining to Collateral.

e.    Debtor has the power to execute this Security Agreement, to perform its obligations hereunder, and to subject Collateral to the security interest created hereby.

f.    Debtor shall deliver such documents as reasonably requested by Secured Party, to affect the pledge and security interest granted herein.

4.    **Waiver of Duty to Preserve Rights**.  Secured Party may, but need not, take any action to preserve rights against any one or more account debtors (including endorsers) or any instrument or instruments constituting Collateral hereunder; and Secured Party has no obligation with respect to redemption, conversion, warrant, pre-emptive or other rights or dates limiting the exercise of such rights as to any security which may constitute Collateral hereunder.  Debtor expressly waives all requirements of presentment, notice of dishonor, protest, and diligence in collection with respect to all of Collateral.  No omission by Secured Party with respect to any such matter(s) shall in any way impair or discharge the Obligations or any of them.  Debtor understands that Secured Party shall have no duty or obligations to look to or realize upon Collateral for payment, or to protect, preserve or care for Collateral in any manner whatsoever.  The acceptance by Secured Party of Collateral as security for the Obligations, or any failure, neglect or omission on the part of Secured Party to realize upon or to protect, preserve or care for any Collateral shall not in any way affect Debtor's obligations under the Note.

5.    **Voting**.  Unless and until the occurrence of an Event of Default (as defined in Paragraph 6), Debtor shall be entitled to all incidents of ownership of Vivian's Interests, however, that Debtor agrees, however, that in the exercise of such voting rights, Debtor will not take any action which would impair or tend to impair the security interest of Secured Party in the Collateral or reduce the value of the Collateral.

2

**EXHIBIT B-1 TO PURCHASE AGREEMENT**

4819-3247-0740 v.2

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

6.    **Events of Default**.  Debtor shall be in default ("Event of Default") under this Agreement upon the happening of any one of the following events or the existence of any one of the following conditions:

a.    The creation of any encumbrance upon Collateral or the making of any levy, judicial seizure, or attachment thereof or thereon; or

b.    Any default under Note.

7.    **Rights of Secured Party upon Event of Default**.

a.    Upon an Event of Default, Secured Party shall have the rights and remedies provided by the Illinois Uniform Commercial Code, and all other rights and remedies granted at law or in equity, including, without limitation, the right to sell or otherwise dispose of Collateral, or any part thereof, at public or private sale, at prices Secured Party deems best, for cash or credit or for future delivery.  Without precluding any other methods of sale, the sale of Collateral shall have been made in a commercially reasonable manner if conducted in conformity with customary commercial practices of banks disposing of similar property, but in any event Secured Party may sell on such terms as it may choose, without making any representations or warranties and without assuming any credit risk and without any obligation to advertise.  Debtor expressly acknowledges that private sales may be less favorable to a seller than public sales but that private sales shall nevertheless be deemed commercially reasonable and permitted hereunder.

b.    If any notification of intended disposition of any of the Collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least 5 days before such intended disposition with a copy sent via email.  Any such notification shall be transmitted to Debtor at the address shown above, by ordinary mail, with postage prepaid, or at any other address subsequently designated by Debtor in writing with copies via email to vmurph1@gmail.com and to SML@H2Law.com.  Notification shall not be necessary if Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold in a recognized market.  Any proceeds derived from the disposition of Collateral and any balance of such proceeds may be applied by Secured Party to the payment of Obligations, in such order of application as Secured Party may from time to time elect.  Debtor does hereby agree to indemnify, defend and hold Secured Party harmless from any and all claims, causes of action, and liabilities relating to any action of Secured Party in dealing with the Collateral.

c.    In addition to all of the other rights possessed by Secured Party in the event of a default, Secured Party may:

i.    Transfer all or any part of Collateral into the name of Secured Party or its nominee, with or without disclosing that Collateral is subject to the lien and security interest granted hereunder;

3

**EXHIBIT B-1 TO PURCHASE AGREEMENT**

4819-3247-0740 v.2

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

ii.    Notify some or all parties obligated on any of Collateral to make payment to Secured Party of any or all amounts due or to become due thereunder;

iii.    Enforce collection of any of Collateral by suit or otherwise, or surrender, release or exchange all or any part of Collateral, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness evidenced thereby;

iv.    Take control of any or all proceeds of, income or dividends from Collateral;

v.    Exercise such additional rights and powers, if any, with respect to any security for or guaranty of any of Obligations, as may be provided in any written instrument which is in addition to this Agreement or the Note.

8.    **Duration**.  This Agreement shall be and remain in force from the date first above mentioned until Obligations have been fully paid.

9.    **Law Governing**.  This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed this ___ day of December ___, 2020.

**DEBTOR**                          **SECURED PARTY**


_____          _____
Vickie White                          Vivian Murphy


4819-3247-0740, v. 2

4
**EXHIBIT B-1 TO PURCHASE AGREEMENT**

4819-3247-0740 v.2

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

## CSLH PLEDGE AND SECURITY AGREEMENT

This CSLH Pledge and Security Agreement is given by Vickie White ("Debtor") in favor of Astrid Cooper ("Secured Party").

## WITNESSETH:

WHEREAS, Debtor and Secured Party are parties to the CSLH Membership Interest Purchase Agreement entered into by the parties on December ____, 2020 (the "Agreement"), pursuant to which Secured Party sold 5% of the membership interests in Chicago South Loop Hotel, LLC, being all of her membership interests, to Debtor (the "Astrid's Interests");

WHEREAS, 75% of the purchase price for Astrid's Interests is payable by the delivery to Secured Party of the Promissory Note of even date herewith, in the principal amount of Seven Hundred Fifty-Six Thousand Seventy-Five Dollars ($756,075) (the "Note"); and

WHEREAS, the Note provides that Debtor shall grant to Secured Party a first priority security interest in 100% of Astrid's Interests to secure performance and payment of all of Debtor's obligations under the Note.

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Grant of Security Interest – Collateral.** To secure the Obligations (as defined in Paragraph 2), Debtor hereby grants to Secured Party a first priority security interest in 100% of Astrid's Interests (the "Collateral").

2. **Obligations.** The obligations secured by this Agreement ("Obligations") are the following:

      a.    The indebtedness of Debtor to Secured Party evidenced by the Note; and

      b.    Court costs, and attorneys' fees and expenses, of Secured Party incurred in connection herewith or with the Note; and

      c.    Any other sum due under the Note.

      d.    Debtor's obligation to pay the Purchase Price as required by the Agreement, and attorneys' fees and expenses, of Secured Party incurred in connection with enforcing Debtor's obligation to pay the Purchase Price.

3. **Representation , Warranties, and Promises.** Debtor represents, warrants, and promises as follows:

1

**EXHIBIT B-2 TO PURCHASE AGREEMENT**

4816-1409-6852 v.2

a.      Debtor is the owner of the Collateral free and clear of any claim of any kind other than the security interest herein granted. No security agreement, financing statement or lien instrument covering all or any part of Collateral is on file or on record in any public office. Debtor will at any time defend Collateral against any and all claims of any person adverse to the claim of Secured Party. Debtor has full power and authority to enter into this Security Agreement.

b.      Debtor authorizes Secured Party to advance for Debtor's account, after giving reasonable notice to Debtor, any sum reasonably necessary to preserve Collateral.

c.      All of the representations and warranties in the Note and in any other notes or instruments pertaining to Collateral are true and correct.

d.      Debtor shall comply with all of her agreements and promises in the Note and in any other notes or instruments pertaining to Collateral.

e.      Debtor has the power to execute this Security Agreement, to perform its obligations hereunder, and to subject Collateral to the security interest created hereby.

f.      Debtor shall deliver such documents as reasonably requested by Secured Party, to affect the pledge and security interest granted herein.

4.      **Waiver of Duty to Preserve Rights**. Secured Party may, but need not, take any action to preserve rights against any one or more account debtors (including endorsers) or any instrument or instruments constituting Collateral hereunder; and Secured Party has no obligation with respect to redemption, conversion, warrant, pre-emptive or other rights or dates limiting the exercise of such rights as to any security which may constitute Collateral hereunder. Debtor expressly waives all requirements of presentment, notice of dishonor, protest, and diligence in collection with respect to all of Collateral. No omission by Secured Party with respect to any such matter(s) shall in any way impair or discharge the Obligations or any of them. Debtor understands that Secured Party shall have no duty or obligations to look to or realize upon Collateral for payment, or to protect, preserve or care for Collateral in any manner whatsoever. The acceptance by Secured Party of Collateral as security for the Obligations, or any failure, neglect or omission on the part of Secured Party to realize upon or to protect, preserve or care for any Collateral shall not in any way affect Debtor's obligations under the Note.

5.      **Voting**. Unless and until the occurrence of an Event of Default (as defined in Paragraph 6), Debtor shall be entitled to all incidents of ownership of Astrid's Interests, however, that Debtor agrees, however, that in the exercise of such voting rights, Debtor will not take any action which would impair or tend to impair the security interest of Secured Party in the Collateral or reduce the value of the Collateral.

**EXHIBIT B-2 TO PURCHASE AGREEMENT**

4816-1409-6852 v.2

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

6.    **Events of Default**.  Debtor shall be in default ("Event of Default") under this Agreement upon the happening of any one of the following events or the existence of any one of the following conditions:

a.    The creation of any encumbrance upon Collateral or the making of any levy, judicial seizure, or attachment thereof or thereon; or

b.    Any default under Note.

7.    **Rights of Secured Party upon Event of Default**.

a.    Upon an Event of Default, Secured Party shall have the rights and remedies provided by the Illinois Uniform Commercial Code, and all other rights and remedies granted at law or in equity, including, without limitation, the right to sell or otherwise dispose of Collateral, or any part thereof, at public or private sale, at prices Secured Party deems best, for cash or credit or for future delivery.  Without precluding any other methods of sale, the sale of Collateral shall have been made in a commercially reasonable manner if conducted in conformity with customary commercial practices of banks disposing of similar property, but in any event Secured Party may sell on such terms as it may choose, without making any representations or warranties and without assuming any credit risk and without any obligation to advertise.  Debtor expressly acknowledges that private sales may be less favorable to a seller than public sales but that private sales shall nevertheless be deemed commercially reasonable and permitted hereunder.

b.    If any notification of intended disposition of any of the Collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least 5 days before such intended disposition with a copy sent via email.  Any such notification shall be transmitted to Debtor at the address shown above, by ordinary mail, with postage prepaid, or at any other address subsequently designated by Debtor in writing with copies via email to amcooper3@gmail.com and to SML@H2Law.com.  Notification shall not be necessary if Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold in a recognized market.  Any proceeds derived from the disposition of Collateral and any balance of such proceeds may be applied by Secured Party to the payment of Obligations, in such order of application as Secured Party may from time to time elect.  Debtor does hereby agree to indemnify, defend and hold Secured Party harmless from any and all claims, causes of action, and liabilities relating to any action of Secured Party in dealing with the Collateral.

c.    In addition to all of the other rights possessed by Secured Party in the event of a default, Secured Party may:

i.    Transfer all or any part of Collateral into the name of Secured Party or its nominee, with or without disclosing that Collateral is subject to the lien and security interest granted hereunder;

3

**EXHIBIT B-2 TO PURCHASE AGREEMENT**

4816-1409-6852 v.2

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

      ii.     Notify some or all parties obligated on any of Collateral to make payment to Secured Party of any or all amounts due or to become due thereunder;

      iii.    Enforce collection of any of Collateral by suit or otherwise, or surrender, release or exchange all or any part of Collateral, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness evidenced thereby;

      iv.    Take control of any or all proceeds of, income or dividends from Collateral;

      v.     Exercise such additional rights and powers, if any, with respect to any security for or guaranty of any of Obligations, as may be provided in any written instrument which is in addition to this Agreement or the Note.

    8.    **Duration**. This Agreement shall be and remain in force from the date first above mentioned until Obligations have been fully paid.

    9.    **Law Governing**. This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

    **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed this ___ day of December ___, 2020.

**DEBTOR**                   **SECURED PARTY**

_____       _____

Vickie White                     Astrid Cooper

4816-1409-6852, v. 2

**EXHIBIT B-2 TO PURCHASE AGREEMENT**

4816-1409-6852 v.2

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

## PROMISSORY NOTE

$ 1,512,150                                                     Dated: December 30, 2020

In consideration of the mutual promises, agreements and covenants contained herein, the undersigned, Vickie White ("Obligor"), agrees and promises to pay Vivian Murphy ("Obligee") One Million Five Hundred Twelve Thousand One Hundred Fifty Dollars ($1,512,150) ("Principal Amount"), with interest as stated in this Promissory Note.

1. **Promissory Note Secured by Stock.** All sums due under this Promissory Note are secured by 100% of Vivian's Interests, being 10% of the membership interests in Chicago South Loop Hotel, LLC, as defined in the CSLH Membership Interest Purchase Agreement entered into by the parties on December 30, 2020. Obligor grants to Obligee a first priority security interest in Vivian's Interests and pledges Vivian's Interests to Obligee pursuant to the Security Agreement of even date hereof.

2. **Payment of Principal and Interest.** This Promissory Note shall bear interest at the rate of five (5%) percent per annum and amortized over two (2) years until the Principal Amount has been paid in full, as reflected on **Exhibit 1** to this Promissory Note. Obligor shall pay to Obligee the Principal Amount with: (a) 24 equal monthly installments of $8,115.55, with the first monthly installment due on March 1, 2021, and thereafter on the first of each month, and (b) the final payment of $1,466,389.12 due February 1, 2023, in accordance with the amortization schedule attached as **Exhibit 1**.

A late charge equal to 5% of the amount of any principal and interest installment so due, or equal to $25, whichever is greater, shall be added to such installment payment if not made within seven calendar days after the due date.

3. **Payments.** All payments due hereunder are to be made to Obligee via electronic transfer or such place designated in writing by Obligee, in the most legal tender of the United States of America current on the date such sums or payments are respectively due.

4. **Default and Acceleration of Indebtedness.** If any payment due on this Promissory Note is not received by Obligee within five (5) days after the due date, Obligee shall provide written notice to Obligor and a copy of such notice via electronic mail. Obligor shall have five (5) days after such notice to cure the default by making such payment in accordance with this Note (the "Cure Period"). If the payment remains unpaid after the Cure Period, the entire unpaid Principal Amount, together with interest accrued thereon, shall become immediately due and payable at the place of payment aforesaid.

Obligor hereby agrees that in the event any payment due hereunder is not paid within five (5) days of the Due Date or during the subsequent Cure Period, that the rate of interest on this Note, at the election of Obligee without notice or demand, which is hereby expressly waived, shall be increased to equal to 9% per year ("Default Rate"). Obligor shall be obligated to pay interest on the unpaid principal balance of this Note at the Default Rate, to be computed from the Note's origination date through and including the date of actual receipt of the overdue payment, whether

4837-5166-5621 v.1                    **EXHIBIT B**

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

that overdue payment is a monthly installment payment or the entire indebtedness. Nothing herein shall be construed as an agreement or privilege to accelerate or extend the date of the payment of any installment of the indebtedness, or of the entire indebtedness, nor as a waiver of any other right or remedy accruing to Obligee by reason of any such default.

5.  **Remedies.**  The remedies of Obligee, or other holder hereof, as provided herein and in the Security Agreement shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of Obligee, or other holder hereof, and may be exercised as often as occasion therefore shall arise. Failure of Obligee, or other holder hereof, for any period of time or on more than one occasion, to exercise its option to accelerate the indebtedness, as provided in Section 4 hereof, shall not constitute a waiver of the right to exercise the same at any time thereafter. No act of omission or commission of Obligee, or other holder hereof, including specifically any failure to exercise any right, remedy or recourse, shall be deemed a waiver or release of the same and any such waiver or release is to be effected only through a written document executed by Obligee, or other holder hereof, and then only to the extent specifically recited therein.

6.  **No Waiver.**  A waiver or release with reference to any one Event of Default shall not be construed as a waiver or release of any subsequent Event of Default or as a bar to any subsequent exercise of Obligee's or other holder's rights or remedies hereunder. Except as otherwise specifically required herein, notice of the exercise of any right or remedy granted to Obligee, or other holder hereof, by this Promissory Note is not required to be given.

7.  **Prepayment.**  Obligor shall have the right to prepay, without penalty, the unpaid Principal Amount, in whole or in part, at any time.

8.  **Costs of Collection.**  In the event that this Promissory Note is placed in the hands of an attorney-at-law for collection upon the occurrence of an Event of Default or to enforce any of the rights or requirements contained herein; or in the event that proceedings at law, in equity, bankruptcy, receivership or other legal proceedings are instituted in connection herewith; or if Obligee, or other holder hereof, is made a party to any such proceeding, Obligor hereby agrees to pay all reasonable costs of collecting or attempting to collect this Promissory Note, as well as to pay all reasonable costs of collecting or attempting to collect from Obligor any outstanding amounts due hereunder and any costs of protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to the Principal Amount, interest and other amounts payable hereunder.

9.  **Waiver of Presentment, Protest and Notice of Dishonor.**  Obligor and all other makers, endorsers, guarantors and sureties hereof, if any, jointly and severally waive presentment, protest and notice of dishonor.

10.  **Business Purposes.**  This Promissory Note is made for business purposes.

11.  **Time.**  Time is of the essence of this Promissory Note and each of the provisions hereof.

2

4837-5166-5621 v.1

FILED DATE: 6/13/2023 2:06 PM  2019CH10966

12.  **Governing Law.**  This Promissory Note has been negotiated in, has been executed and delivered in, is payable in and shall be governed by the laws of the State of Illinois.

13.  **Headings.**  All headings are for convenience purposes only and shall not be construed to define or otherwise limit the provisions of this Promissory Note.

14.  **Interpretation.**  The language in all parts of this Promissory Note shall be in all cases construed simply according to its fair meaning and not strictly for or against any party. All words used herein in the singular number shall extend to and include the plural number. All words used herein in the plural number shall extend to and include the singular number. All words used in any gender, male, female or neuter shall extend to and include all genders as may be applicable in any particular context. This Promissory Note has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein. Accordingly, any rule of law or any other statutes, legal decisions or common law principles of similar effect that would require interpretation of any ambiguities against the party that has drafted it or them are of no application and are hereby expressly waived by all parties hereto.

15.  **Binding Agreement; Assignment.**  This Promissory Note shall be binding upon and inure to the benefit of the parties named herein and to their respective successors and assigns. This Promissory Note may be assigned by Obligee without the consent of Obligor. This Promissory Note and the rights, interests and obligations of Obligor may not be assigned without the written consent of Obligee.

**IN WITNESS WHEREOF,** Obligor has executed and delivered this Promissory Note on the day and year first above written.

**OBLIGOR**

_____
Vickie White

4837-5165-5621 v.1

FILED DATE: 6/13/2023 2:06 PM  2019CH10966

## Amortization Schedule

## EXHIBIT 1 to Murphy Promissory Note

# Business Loan Calculator



| Loan Amount | 1512150 |
| Interest Rate | 5 |
| Compound | Monthly (APR) |
| Loan Term | 30 years |
| | 0 months |
| Pay Back | Every Month |
| Origination Fee | 0 |
| Other Fees | 0 |

**$8,117.55 Per Month**

Total of 360 Loan Payments  $2,922,317.34

Interest  $1,410,167.34

## Amortization Schedule

| | Beginning Balance | Interest | Principal | Ending Balance |
|---|---|---|---|---|
| 1 | $1,512,150.00 | $6,300.63 | -$1,816.92 | $1,510,333.08 |
| 2 | $1,510,333.08 | $6,293.05 | -$1,824.49 | $1,508,508.58 |
| 3 | $1,508,508.58 | $6,285.45 | -$1,832.10 | $1,506,676.49 |
| 4 | $1,506,676.49 | $6,277.82 | -$1,839.73 | $1,504,836.76 |
| 5 | $1,504,836.76 | $6,270.15 | -$1,847.40 | $1,502,989.36 |
| 6 | $1,502,989.36 | $6,262.46 | -$1,855.09 | $1,501,134.27 |

4

4837-5166-5621 v.1

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

| 7 | $1,501,134.27 | $6,254.73 | -$1,862.82 | $1,499,271.45 |
| 8 | $1,499,271.45 | $6,246.96 | -$1,870.58 | $1,497,400.86 |
| 9 | $1,497,400.86 | $6,239.17 | -$1,878.38 | $1,495,522.49 |
| 10 | $1,495,522.49 | $6,231.34 | -$1,886.20 | $1,493,636.28 |
| 11 | $1,493,636.28 | $6,223.48 | -$1,894.06 | $1,491,742.22 |
| 12 | $1,491,742.22 | $6,215.59 | -$1,901.96 | $1,489,840.26 |
| | | Year #1 End | | |
| 13 | $1,489,840.26 | $6,207.67 | -$1,909.88 | $1,487,930.38 |
| 14 | $1,487,930.38 | $6,199.71 | -$1,917.84 | $1,486,012.54 |
| 15 | $1,486,012.54 | $6,191.72 | -$1,925.83 | $1,484,086.72 |
| 16 | $1,484,086.72 | $6,183.69 | -$1,933.85 | $1,482,152.86 |
| 17 | $1,482,152.86 | $6,175.64 | -$1,941.91 | $1,480,210.95 |
| 18 | $1,480,210.95 | $6,167.55 | -$1,950.00 | $1,478,260.95 |
| 19 | $1,478,260.95 | $6,159.42 | -$1,958.13 | $1,476,302.82 |
| 20 | $1,476,302.82 | $6,151.26 | -$1,966.29 | $1,474,336.53 |
| 21 | $1,474,336.53 | $6,143.07 | -$1,974.48 | $1,472,362.05 |
| 22 | $1,472,362.05 | $6,134.84 | -$1,982.71 | $1,470,379.35 |
| 23 | $1,470,379.35 | $6,126.58 | -$1,990.97 | $1,468,388.38 |
| 24 | $1,468,388.38 | $6,118.28 | -$1,999.26 | $1,466,389.12 |

4837-5166-5621 v.1

FILED DATE: 6/13/2023 2:06 PM    2019CH10966

## PROMISSORY NOTE

**$756,075**                                              **Dated: December 30, 2020**

In consideration of the mutual promises, agreements and covenants contained herein, the undersigned, Vickie White ("Obligor"), agrees and promises to pay Astrid Cooper ("Obligee") Seven Hundred Fifty Six Thousand Seventy-Five Dollars ($756,075) ("Principal Amount"), with interest as stated in this Promissory Note.

1.    **Promissory Note Secured by Stock**. All sums due under this Promissory Note are secured by 100% of Astrid's Interests, being 5% of the membership interests in Chicago South Loop Hotel, LLC, as defined in the CSLH Membership Interest Purchase Agreement entered into by the parties on December 30, 2020. Obligor grants to Obligee a first priority security interest in Astrid's Interests and pledges Astrid's Interests to Obligee pursuant to the Security Agreement of even date hereof.

2.    **Payment of Principal and Interest**. This Promissory Note shall bear interest at the rate of five (5%) percent per annum and amortized over two (2) years until the Principal Amount has been paid in full, as reflected on **Exhibit 1** to this Promissory Note. Obligor shall pay to Obligee the Principal Amount with: (a) 24 equal monthly installments of **$4,058.77**, with the first monthly installment due on March 1, 2021, and thereafter on the first of each month, and (b) the final payment of **$733,194.56** due February 1, 2023, in accordance with the amortization schedule attached as **Exhibit 1**.

A late charge equal to 5% of the amount of any principal and interest installment so due, or equal to $25, whichever is greater, shall be added to such installment payment if not made within seven calendar days after the due date.

3.    **Payments**. All payments due hereunder are to be made to Obligee via electronic transfer or such place designated in writing by Obligee, in the most legal tender of the United States of America current on the date such sums or payments are respectively due.

4.    **Default and Acceleration of Indebtedness**. If any payment due on this Promissory Note is not received by Obligee within five (5) days after the due date, Obligee shall provide written notice to Obligor and a copy of such notice via electronic mail. Obligor shall have five (5) days after such notice to cure the default by making such payment in accordance with this Note (the "Cure Period"). If the payment remains unpaid after the Cure Period, the entire unpaid Principal Amount, together with interest accrued thereon, shall become immediately due and payable at the place of payment aforesaid.

Obligor hereby agrees that in the event any payment due hereunder is not paid within five (5) days of the Due Date or during the subsequent Cure Period, that the rate of interest on this Note, at the election of Obligee without notice or demand, which is hereby expressly waived, shall be increased to be equal to 9% per year ("Default Rate"). Obligor shall be obligated to pay interest on the unpaid principal balance of this Note at the Default Rate, to be computed from the Note's origination date through and including the date of actual receipt of the overdue payment, whether that overdue payment is a monthly installment payment or the entire indebtedness. Nothing herein shall be construed as an agreement or privilege to accelerate or extend the date of the payment of

1

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

any installment of the indebtedness, or of the entire indebtedness, nor as a waiver of any other right or remedy accruing to Obligee by reason of any such default.

5.   **Remedies**.  The remedies of Obligee, or other holder hereof, as provided herein and in the Security Agreement shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of Obligee, or other holder hereof, and may be exercised as often as occasion therefore shall arise.  Failure of Obligee, or other holder hereof, for any period of time or on more than one occasion, to exercise its option to accelerate the indebtedness, as provided in Section 4 hereof, shall not constitute a waiver of the right to exercise the same at any time thereafter.  No act of omission or commission of Obligee, or other holder hereof, including specifically any failure to exercise any right, remedy or recourse, shall be deemed a waiver or release of the same and any such waiver or release is to be effected only through a written document executed by Obligee, or other holder hereof, and then only to the extent specifically recited therein.

6.   **No Waiver**.  A waiver or release with reference to any one Event of Default shall not be construed as a waiver or release of any subsequent Event of Default or as a bar to any subsequent exercise of Obligee's or other holder's rights or remedies hereunder.  Except as otherwise specifically required herein, notice of the exercise of any right or remedy granted to Obligee, or other holder hereof, by this Promissory Note is not required to be given.

7.   **Prepayment**.  Obligor shall have the right to prepay, without penalty, the unpaid Principal Amount, in whole or in part, at any time.

8.   **Costs of Collection**.  In the event that this Promissory Note is placed in the hands of an attorney-at-law for collection upon the occurrence of an Event of Default or to enforce any of the rights or requirements contained herein; or in the event that proceedings at law, in equity, bankruptcy, receivership or other legal proceedings are instituted in connection herewith; or if Obligee, or other holder hereof, is made a party to any such proceeding, Obligor hereby agrees to pay all reasonable costs of collecting or attempting to collect this Promissory Note, as well as to pay all reasonable costs of collecting or attempting to collect from Obligor any outstanding amounts due hereunder and any costs of protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to the Principal Amount, interest and other amounts payable hereunder.

9.   **Waiver of Presentment, Protest and Notice of Dishonor**.  Obligor and all other makers, endorsers, guarantors and sureties hereof, if any, jointly and severally waive presentment, protest and notice of dishonor.

10.   **Business Purposes**.  This Promissory Note is made for business purposes.

11.   **Time**.  Time is of the essence of this Promissory Note and each of the provisions hereof.

12.   **Governing Law**.  This Promissory Note has been negotiated in, has been executed and delivered in, is payable in and shall be governed by the laws of the State of Illinois.

2

4849-1119-4069 v.1

13. **Headings**. All headings are for convenience purposes only and shall not be construed to define or otherwise limit the provisions of this Promissory Note.

14. **Interpretation**. The language in all parts of this Promissory Note shall be in all cases construed simply according to its fair meaning and not strictly for or against any party. All words used herein in the singular number shall extend to and include the plural number. All words used herein in the plural number shall extend to and include the singular number. All words used in any gender, male, female or neuter shall extend to and include all genders as may be applicable in any particular context. This Promissory Note has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein. Accordingly, any rule of law or any other statutes, legal decisions or common law principles of similar effect that would require interpretation of any ambiguities against the party that has drafted it or them are of no application and are hereby expressly waived by all parties hereto.

15. **Binding Agreement; Assignment**. This Promissory Note shall be binding upon and inure to the benefit of the parties named herein and to their respective successors and assigns. This Promissory Note may be assigned by Obligee without the consent of Obligor. This Promissory Note and the rights, interests and obligations of Obligor may not be assigned without the written consent of Obligee.

**IN WITNESS WHEREOF**, Obligor has executed and delivered this Promissory Note on the day and year first above written.

**OBLIGOR**

_Vickie White_

Vickie White

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

3

4849-1119-4069 v.1

## Amortization Schedule

## EXHIBIT 1 to Cooper Promissory Note

# Business Loan Calculator

| | |
|---|---|
| Loan Amount | 756075 |
| Interest Rate | 5 |
| Compound | Monthly (APR) |
| Loan Term | 30 years |
| | 0 months |
| Pay Back | Every Month |
| Origination Fee | 0 |
| Documentation Fee | |
| Other Fees | 0 |

**$4,058.77 Per Month**

| | |
|---|---|
| Total of 360 Loan Payments | $1,461,158.67 |
| Interest | $705,083.67 |

## Amortization Schedule

| | Beginning Balance | Interest | Principal | Ending Balance |
|---|---|---|---|---|
| 1 | $756,075.00 | $3,150.31 | -$908.46 | $755,166.54 |
| 2 | $755,166.54 | $3,146.53 | -$912.25 | $754,254.29 |
| 3 | $754,254.29 | $3,142.73 | -$916.05 | $753,338.24 |
| 4 | $753,338.24 | $3,138.91 | -$919.86 | $752,418.38 |
| 5 | $752,418.38 | $3,135.08 | -$923.70 | $751,494.68 |
| 6 | $751,494.68 | $3,131.23 | -$927.55 | $750,567.14 |

4849-1119-4069 v.1

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

FILED DATE: 6/13/2023 2:06 PM   2019CH10966

| | | | | |
|---|---|---|---|---|
| 7 | $750,567.14 | $3,127.36 | -$931.41 | $749,635.72 |
| 8 | $749,635.72 | $3,123.48 | -$935.29 | $748,700.43 |
| 9 | $748,700.43 | $3,119.59 | -$939.19 | $747,761.24 |
| 10 | $747,761.24 | $3,115.67 | -$943.10 | $746,818.14 |
| 11 | $746,818.14 | $3,111.74 | -$947.03 | $745,871.11 |
| 12 | $745,871.11 | $3,107.80 | -$950.98 | $744,920.13 |
| **Year #1 End** | | | | |
| 13 | $744,920.13 | $3,103.83 | -$954.94 | $743,965.19 |
| 14 | $743,965.19 | $3,099.85 | -$958.92 | $743,006.27 |
| 15 | $743,006.27 | $3,095.86 | -$962.91 | $742,043.36 |
| 16 | $742,043.36 | $3,091.85 | -$966.93 | $741,076.43 |
| 17 | $741,076.43 | $3,087.82 | -$970.96 | $740,105.48 |
| 18 | $740,105.48 | $3,083.77 | -$975.00 | $739,130.47 |
| 19 | $739,130.47 | $3,079.71 | -$979.06 | $738,151.41 |
| 20 | $738,151.41 | $3,075.63 | -$983.14 | $737,168.27 |
| 21 | $737,168.27 | $3,071.53 | -$987.24 | $736,181.03 |
| 22 | $736,181.03 | $3,067.42 | -$991.35 | $735,189.67 |
| 23 | $735,189.67 | $3,063.29 | -$995.48 | $734,194.19 |
| 24 | $734,194.19 | $3,059.14 | -$999.63 | $733,194.56 |

4849-1119-4069 v.1